# UNITED STATES DISTRICT COURT

__NORTHERN_____ DISTRICT OF : __ILLINOIS, EASTERN DIVISION_____

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL COMPLAINT |
| v. | **08 CR    851** |
| WILLIAM WHITE | CASE NUMBER: |

**FILED**
10-17-08
OCT 17 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**MAGISTRATE JUDGE COX**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about September 11, 2008, in Cook County, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant:

> with intent that another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of force against the person of Hale Juror A in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, solicited and otherwise attempted to persuade such other person to engage in such conduct; in that defendant solicited and otherwise attempted to persuade another person to injure Hale Juror A on account of a verdict assented to by Hale Juror A, in violation of Title 18, United States Code Section 1503;

all in violation of Title 18, United States Code, Section 373.

I further state that I am a Special Agent of the Federal Bureau of Investigation and that this complaint is based on the following facts:

PLEASE SEE ATTACHED AFFIDAVIT.

Continued on the attached sheet and made a part hereof: _X_ Yes _____ No

Maureen Mazzola, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

October 17, 2008                                    at    Chicago, Illinois
Date                                                                         City and State

Susan E. Cox, United States Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

STATE OF ILLINOIS      )
                               )    SS
COUNTY OF COOK      )

## AFFIDAVIT

I, Maureen E. Mazzola, having been duly sworn on oath, state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI). I have been employed as a Special Agent since 2004. and I am currently assigned to the FBI's Chicago Field Division.

2.      As a Special Agent with the FBI, I have performed a variety of investigative tasks, including functioning as a case agent in cases involving domestic terrorism violent crimes. I have received extensive training and have experience in all manner of investigative techniques, including surveillance, search warrants, and interviews of witnesses. I have also received extensive training in the tactics and methods of terrorist organizations, including domestic terrorists.

3.      The information contained in this affidavit is based on my personal knowledge, as well as information obtained from official documents and records, the personal knowledge of other law enforcement officials, surveillance, and interviews of witnesses.

4.      This affidavit is being submitted for the limited purpose of setting forth probable cause to support a criminal complaint. I have not set forth each and every fact known to me concerning this investigation. Rather, I have set forth only those facts that I believe are sufficient to establish probable cause to believe that William White, with intent that another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of force against the person of Hale Juror A in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, solicited and otherwise attempted to persuade

-1-

such other person to engage in such conduct; in that defendant solicited and otherwise attempted to persuade another person to injure Hale Juror A on account of a verdict assented to by Hale Juror A, in violation of Title 18, United States Code Section 1503; all in violation of Title 18, United States Code, Section 373.

## *Background*

5.     In or about January 2003, Matthew Hale, the leader of a white supremacist organization known as the World Church of the Creator, was charged in a federal criminal case in the Northern District of Illinois with solicitation of the murder of United States District Judge Joan Humphrey Lefkow and obstruction of justice. Hale was tried before a jury in the Northern District of Illinois, convicted of all charges, and sentenced to 480 months' imprisonment. Hale Juror A was the foreperson of that jury. The Seventh Circuit affirmed Hale's conviction in May 2006. *United States v. Hale*, 448 F.3d 971 (7th Cir. 2006). Because the facts of the Hale case bear on the motive and nature of the offense that is the focus of the present investigation, the factual summary of that case, excerpted from the Seventh Circuit's opinion, is reproduced as Attachment A to this Affidavit.

## *Definitions*

6.     *Internet Service Providers:* Internet Service Providers ("ISPs") are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet including telephone-based dial-up, broadband-based access via digital subscriber line (DSL) or cable television, dedicated circuits, or satellite-based subscription. ISPs typically charge a fee based upon the type of connection and

volume of data, called "bandwidth," that the connection supports. By using a computer equipped with a modem, the subscriber can establish communication with an ISP over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password. ISPs maintain records ("ISP records") pertaining to their subscribers (regardless of whether those subscribers are individuals or entities). These records may include account application information, subscriber and billing information, account access information (often times in the form of log files), e-mail communications, information concerning content uploaded and/or stored on or via the ISP's servers, and other information, which may be stored both in computer data format and in written or printed record format.

7.    *IP Address:* An Internet Protocol address ("IP" address) is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic to and from that computer may be properly directed from its source to its destination. Most ISPs control a range of IP addresses.

8.    *Domain Name:* A domain name identifies a computer or group of computers on the Internet, and corresponds to one or more IP addresses assigned to those computers. Domain names are typically strings of alphanumeric characters, with each "level" of the domain delimited by a period (e.g., Computer.networklevel1.networklevel2.com). Domain names are used to make finding and accessing network resources easier and to limit the need for end users to know specific IP addresses assigned to a particular resource (e.g., the IP address for "abc company" may be 10.47.53.126, while the corresponding domain name an end user would have to know might be only "www.abccompany.com.").

-3-

9.      Hypertext: Hypertext is a process of linking related information by electronic connections in order to allow a user easy access between them. Hypertext is a feature of some computer programs that allows the user to select a word and receive additional information, such as a definition or related material. In Internet browsers, hypertext links (also referred to as links or hotlinks) are usually denoted by highlighting a word or phrase with a different font, color, or text emphasis such as underlining. Hypertext links create a branching or network structure that permits direct, unmediated jumps to related information (e.g. when an Internet user clicks the hypertext link, they are immediately taken to another location of the Internet related to the hypertext link).

**Phone Call and Text Messages**

10.     According to Hale Juror A, at approximately 9:30 a.m. Central Daylight Time on or about September 11, 2008, Hale Juror A received a call on his/her cellular telephone from telephone number (540) 798-1393. According to Hale Juror A, the caller spoke in what sounded like a male's voice, but did not identify himself. The caller asked whether he was speaking to Hale Juror A. After Hale Juror A responded yes, the caller asked whether Hale Juror A's date of birth was a certain date. Hale Juror A confirmed that the caller was speaking to the "Hale Juror A" born on that date. The caller then asked whether Hale Juror A lived at a specific address and whether he/she served on the jury in the trial of Matthew Hale. Hale Juror A then asked the caller what these questions were in relation to. The caller then responded with words to the effect of, "that's all I need to know," and hung up the phone.

11.     According to Hale Juror A, for approximately the next half-hour after this call, Hale Juror A received approximately 50 text messages on his/her cellular phone. Based on Hale Juror A's review of these the text messages, these messages appeared to come from either anonymous sources

-4-

or from e-mail accounts including the words, "Sodomize [Public Official A]," "[Public Official B] Cellular," and "Bomb China," in the title of the e-mail addresses. I know from my training and experience that it is possible to send a text message from a computer to a cellular telephone through the use of an e-mail account.

12. Based on Hale Juror A's description of the text messages, several of the approximately 50 text messages received were not written in complete words and appeared to be incomplete or unreadable segments of computer code. According to Hale Juror A, the messages that were readable contained statements in support of white supremacy.

***Overthrow.com***

13. On or about September 11, 2008, law enforcement personnel entered Hale Juror A's name into the search field of Google.com, a publicly available Internet search engine. This search revealed an entry for an Internet posting on the website with the domain name, "Overthrow.com." The search result displayed what purported to be Hale Juror A's name, date of birth, and home address, along with the statement that Hale Juror A was a juror "who played a key role in convicting Hale." *See* Exhibit 1, Google Search Results.

*Exhibit 1: Google Search Results (Redacted)*



14.     After viewing these Google search results, FBI agents visited the website with the domain name overthrow.com. The front page of overthrow.com contained an entry dated September 11, 2008 that was titled, "The Juror Who Convicted Matt Hale." The entry read: "Gay anti-racist [Hale Juror A] was a juror who played a key role in convicting Matt Hale. Born [date], [he/she] lives at [address] with [his/her] gay black lover and [his/her] cat [name]." [His/Her] phone number is [phone number], cell phone [phone number], and [his/her] office is [phone number]. The entry also featured a color photograph of Hale Juror A. *See* Exhibit 2, Hale Juror A Overthrow.com Posting. According to Hale Juror A, the information posted on the website contained his/her true date of birth, cellular phone number, and work phone number. The information pertaining to Hale Juror A's address and home telephone number was formerly correct; however, Hale Juror A recently moved from that address and acquired a new home telephone number.

*Exhibit 2: Hale Juror A Overthrow.com Posting*



15.     Also posted on the front page of overthrow.com was an entry dated September 9, 2008, and titled, "Kill This Nigger" – [Public Official A] Assassination Magazine." Below this

heading was a photograph depicting Public Official A with cross-hairs taking the form of a swastika over his/her face. The posting stated, "'Kill This Nigger' Anti-[Public Official A] Cover Released ANSWP Seeks $10,000 To Print 20,000 Copies For Distribution Before Election." *See* Exhibit 3, Public Official A Overthrow.com Posting.

*Exhibit 3: Public Official A Overthrow.com Posting*



16.     On or about October 3, 2008, law enforcement agents discovered a new posting to Overthrow.com dated "10/3/2008 1:23:44 AM" and entitled "'Kill This Nigger?' Goes To Print 20,000 Copies Of A 16-Page Magazine; Thank All Of You For Your Support." This posting was attributed to the "Overthrow Staff" and read:

> "Roanoke, Virginia -- The already infamous 'Kill This Nigger?' issue of National Socialist magazine went to print tonight, and will begin distribution the week of October 13th. A nominal 20,000 copies of the magazine, which will likely be 22,000 - 25,000 after overruns, will be distributed in 14 major drops and dozens of smaller lit drops across the country. While last minute donations did push our publishing budget over the top, money is still needed to help support the volunteers who will distribute the issue, and to publish our next, upcoming issue of the magazine on time. A preview of the '[Public Official A] assassination' issue follows:"

17.     Below this article were a series of images of the purported "[Public Official A] assassination" magazine. These images were in color and appeared to be a page-by-page depiction of the contents of the magazine. One of these images appears to be a table of contents section, identifying articles within the magazine, complete with the articles title, page number, and a photo seemingly related to the article. One such article is entitled "JEW-ROR." This article is listed as appearing on page 5 and displays the same photograph of Hale Juror A previously posted on Overthrow.com, described above in paragraph 14 and displayed in redacted form in Exhibit 2. See Exhibit 4, Overthrow.com - "[Public Official A] assassination" magazine images.

*Exhibit 4, Overthrow.com - "[Public Official A] assassination" magazine images*



18.     As can be seen in Exhibit 4 above, adjacent to the posting of the "[Public Official A]

assassination" magazine images on Overthrow.com appears a section entitled "Top Articles 2008."

The article labeled 11, which appears in close proximity to the image and article title regarding Hale

Juror A, is entitled "Kill [Individual A]." The title of this is written as a hypertext link. When

agents clicked on this link, they were immediately redirected to another section of Overthrow.com

showing a posting dated "3/26/2008 5:59:13 AM" and titled, "Kill [Individual A] Man Behind

Human Rights Tribunal's Abuses Should Be Executed." The article is attributed to "Bill White."

This article reads in part:

> "Commentary -- [Individual A], the sometimes Jewish, sometimes not, attorney behind the abuses of Canada's Human Rights Tribunal should be drug out into the street and shot, after appropriate trial by a revolutionary tribunal of Canada's white activists. It won't be hard to do, he can be found, easily, at his home, at [Address]...
>
> We may no longer have the social cohesion and sense of purpose necessary to fight as a country, but those of us who have the social cohesion and sense of purpose necessary to unify as a race must take notice of an irreconcilable fact: [Individual A] is an enemy, not just of the white race, but of all humanity, and he must be killed. Find him at home and let him know you agree:[Address]
>
> -----
> Emailed to you by:
> Overthrow.com
> ATTN: Bill White, Editor
> Post Office Box 8601
> Roanoke, VA 24014
> http://12.107.40.66
> nationalsocialistworkers@yahoo.com
> answp@nazi.org"

19.     Agents searched the archived history of the website Overthrow.com. Within the archived files were multiple postings displaying the names and personal identifying information, such as dates of birth, addresses, and telephone numbers, of individuals connected in some way to events depicted in the media, including high-profile events within the criminal justice system. In addition to these postings, there were also editorial comments attributed to the editor of overthrow.com. In one such posting was a statement reading: "When the courts start enforcing laws against Internet threats and actual violence against anti-racists and the mainstream, Jewish owned media which finances and encourages them, I will stop broadcasting people's names and address with the opinion they should be lynched. However, as long as we live in a society in which laws are not enforced against Jews, Marxists and other privileged members of the bourgeoisie, I will take advantage of that and use the lawless chaos they've created to push my view, which is that all Jews

-10-

and Marxists (including their fellow traveling neo-cons, neo-liberals, Zionists and Judaized-Christians in both the Republican and Democratic Parties) should be shot, rather than debated – – along with their fellow travelers and chosen pets in the Negro 'rights' movement."

20.     Also within the archived history of overthrow.com was a post dated February 21, 2007 with the post attributed on the website to Bill White. This post was another editorial comment that appeared to reference a heavily publicized criminal justice matter involving a holocaust survivor in which the defendant was convicted of a hate crime and false imprisonment. A previous posting on overthrow.com had listed what purported to be the name, date of birth, and addresses of this victim. The editorial posting reads in part: "For decades, the Jews and the liars have used physical force, violent attacks on peaceful demonstrators and peaceful meetings, and the violent physical force of unjust and tyrannical laws to silence those who question the holocaust lie. If white people are going to undo this system, we have to be ready to adapt and use the tactics of our exploiters. Insofar as my views may have played a role in motivating [the defendant in that case], I can only say that I hope to inspire a hundred more young white people to sacrifice themselves for our collective racial whole. The only thing more noble than sacrifice is victory."

***Phone Records***

21.     Records obtained from T-Mobile USA pursuant to a Federal Grand Jury Subpoena indicate that telephone number (540) 798-1393 is billed to an account in the name Individual B. The address associated with this account is 3350 Glade Creek Boulevard, N.E. Apartment 4, Roanoke, Virginia, 24012. Law enforcement agents in Roanoke, Virginia informed me that Individual B is the wife of William White. These agents also inform me that through surveillance and other investigative measures, they know that William White currently lives at 3350 Glade Creek

Boulevard, N.E. Apartment 4 in Roanoke, Virginia.

22.     Call history records were also obtained from T-Mobile USA pursuant to a Federal Grand Jury Subpoena for telephone number (540) 798-1393 . These call history records show a call placed from telephone number (540) 798-1393 to Hale Juror A's cellular telephone number on or about September 11, 2008 at approximately 10:30 a.m. Eastern Daylight Time.

**Tracing the IP Address**

23.     Using the publicly available web site www.domaintools.com, law enforcement agents performed a "whois" and "IP history" search for the domain name overthrow.com. A "whois" search provides publicly available information as to which entity is responsible for a particular domain name. An "IP history" search provides archived records reflecting IP addresses that have previously been associated with a given Internet domain name. The search results indicated that the registrant of overthrow.com is William White. The results also list the administrative and technical contact for overthrow.com as William White. The contact information provided for William White includes a P.O. Box in Roanoke, Virginia, as well as the contact telephone number (540) 798-1393 (the same telephone number referenced above in paragraphs 10, 21, and 22). The search results further indicated that the domain overthrow.com was last updated on September 11, 2008 at approximately 3:42 Eastern Daylight Time. In addition, the search results list the description of the domain name overthrow.com as, "Views and news from Bill White of the neo-Nazi 'National Socialist Movement.' Contains bulletins from White's Third Positionist 'Libertarian Socialist News Service.'"

24.     According to the "IP history" records reviewed by the FBI, as of September 15, 2008, overthrow.com was being hosted on IP address 12.107.40.66. The records show that IP address

12.107.40.66 is allocated to AT&T WorldNet Services. Records obtained from AT&T WorldNet Services pursuant to a Federal Grand Jury Subpoena indicate that between September 10, 2008 and September 12, 2008, the IP address 12.107.40.66 was assigned to and maintained by ACC-White Homes and Land LLC. The AT&T WorldNet Services records show that IP address 12.107.40.66 terminated at a computer server located at 1602 Patterson Avenue, S.W., Roanoke, Virginia 24016. The records further list the technical and security contact for ACC-White Homes and Land LLC as Bill White, with a contact address of 1602 Patterson Avenue, S.W., Roanoke, Virginia 24016.

25.     According to an employee of AT&T WorldNet Services, upon review of their records, the fact that the "Site Information" on record list 1602 Patterson Avenue S.W., Apartment 2, Roanoke, VA, confirms that the IP address block 12.107.40.64 through 12.107.40.79 are being delivered to 1602 Patterson Avenue, S.W., Apartment 2, Roanoke, Virginia. Furthermore, the employee of AT&T WorldNet Services stated that AT&T or another local carrier directed by AT&T would have ensured that the proper equipment was installed at 1602 Patterson Avenue, S.W., Apartment 2, Roanoke, VA, so that the IP addresses could be delivered there. AT&T records indicate that Bill White made a request for a dedicated "T1" high-speed internet connection to be installed at 1602 Patterson Avenue, S.W., Apartment 2, Roanoke, Virginia. AT&T records show no change in the physical location of this connection since it was installed and activated in or around March 2008. The AT&T WorldNet Services employee also advised that the user of the IP addresses being delivered to 1602 Patterson Ave. S.W., Apartment 2, Roanoke, VA, could access these same IP addresses remotely from another location utilizing a telephone line.

26.     According to records provided by Appalachian Power, as of October 6, 2008, there were four separate accounts for customers receiving power at 1602 Patterson Avenue, S.W. in

Roanoke Virginia. The records indicate that the registered account holder for the service address of 1602 Patterson Avenue, S.W., Apartment 2 was William White.

**September 23, 2008 Postings**

27.     On or about September 23, 2008, law enforcement agents conducted a surveillance of William White. Agents observed White leave 3350 Glade Creek Boulevard, N.E. Apartment 4, in Roanoke, Virginia and drive away in a silver Toyota. The agents then followed White as White was driving the car. At one point, White stopped the car and approached the agent who was following White. White asked the agent why he was being followed, to which the agent responded that he would not answer White's questions. Following this conversation, agents observed White return to 3350 Glade Creek Boulevard, N.E. Apartment 4, in Roanoke, Virginia. While White was inside this apartment agents observed several postings made to Overthrow.com, attributed to White as "editor." One of these postings was written in the first person and described the law enforcement surveillance of White, including the conversation that occurred between White and the agent who had been following White.

**Computer Server recovered from 1602 Patterson Ave., S.W., Apartment 2**

28.     On or about October 10, 2008, a United States District Court Judge in the Western District of Virginia issued a search warrant for the premises of 1602 Patterson Ave., S.W., Apartment 2. On or about October 11, 2008, law enforcement agents executed a search of that location. During this search, the agents recovered a computer server containing two computer hard drives and a router used to connect the server to the AT&T T1 high speed internet connection.On

29.     On or about October 15, 2008, an FBI forensic examination was conduced on the computer server containing two hard drives seized from 1602 Patterson Ave., S.W., Apartment 2.

This review established that the server was being utilized to host the website Overthrow.com. A review of log files maintained by the server revealed that another computer had remotely connected to the computer server to make postings and updates to Overthrow.com. Further analysis of this log revealed that the server was remotely updated by a computer using IP Address 68.106.93.214 on or about September 23, 2008 at approximately 9:50:01 am Eastern Daylight Time (13:50:01 Greenwich Mean Time) and 10:15:02 am Eastern Daylight Time (14:15:02 Greenwich Mean Time). These times coincide with the articles posted on Overthrow.com referenced in Paragraph 27. Additionally, this analysis revealed that an article posted to Overthrow.com, on or about September 11, 2008 regarding Hale Juror A, which is similar in nature to the posting referred to in paragraph 15, was also posted remotely from a computer using IP Address 68.106.93.214.

30.     FBI analysts determined that IP Address 68.106.93.214 was currently assigned to Cox Communications. Records received from Cox Communications, revealed that, from on or about September 11, 2008 until at least on or about October 14, 2008, IP address 68.106.93.214 was assigned to an account in the William White, with a service address of 3350 Glade Creek Boulevard, Apartment 4, in Roanoke, Virginia, and a contact number of (540) 798-1393. I know from this investigation that 3350 Glade Creek Boulevard, Apartment 4, in Roanoke, Virginia is the current home of William White and that (540) 798-1393 was the telephone number used to contact Hale Juror A on or about September 11, 2008.

*Conclusion*

31.     Based on the aforementioned facts, I respectfully request that a criminal complaint be issued charging William White, with intent that another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of force against the person

of Hale Juror A in violation of the laws of the United States, and under circumstances strongly

corroborative of that intent, solicited and otherwise attempted to persuade such other person to

engage in such conduct; in that defendant solicited and otherwise attempted to persuade another

person to injure Hale Juror A on account of a verdict assented to by Hale Juror A, in violation of

Title 18, United States Code Section 1503; all in violation of Title 18, United States Code, Section

373.


FURTHER AFFIANT SAYETH NOT.


Maureen Mazzola
Special Agent
Federal Bureau of Investigation


Subscribed and sworn before
me this 17th day of October, 2008.


Susan E. Cox
U.S. Magistrate Judge


-16-

## Attachment A
Statement of Facts - *United States v. Hale*, 448 F.3d 971 (7th Cir. 2006)

Hale was the "Pontifex Maximus" of a white supremacist organization formerly known as the World Church of the Creator ("World Church"). A law school graduate, Hale was unable to procure the character and fitness certification necessary for admission to the state bar of Illinois. After he obtained no relief through the administrative appeals process, and after both the Supreme Court of Illinois and the Supreme Court of the United States denied review, Hale unsuccessfully brought constitutional challenges in federal court. *See **Hale v. Comm. on Character & Fitness**, 335 F.3d 678 (7th Cir.2003)*. He later sought, and was denied, bar admission in Iowa as well.

In May 2000 the World Church was sued for trademark infringement by the TE-TA-MA Truth Foundation-Family of URI, Inc. ("the Foundation"), a religious organization that operates under the name "Church of the Creator." Both parties moved for summary judgment, which Judge Lefkow granted in favor of the World Church. On appeal, however, we reversed and remanded with instructions to enter judgment in favor of the Foundation. *__TE-TA-MA Truth Foundation-Family of URI, Inc. v. World Church of the Creator__, 297 F.3d 662 (7th Cir.2002)*. Accordingly, on November 19, 2002, Judge Lefkow entered a detailed order requiring the World Church to stop using variations of the trademarked name "Church of the Creator," to turn over books and other materials bearing the name or obliterate any infringing mark from them, and relinquish custody of the domain names of the World Church's websites to the Foundation. The Foundation soon returned to court seeking enforcement of the order after Hale publicly stated that he would not comply. The court granted the Foundation's motion and ordered Hale to show cause why he should not be held in contempt.

By this time Hale was no stranger to law enforcement authorities; he had been under FBI surveillance since before the trademark suit began. In July 1999 a follower, Benjamin Smith, went on a shooting rampage that left two persons dead and nine others wounded. Days after Hale had publicly announced he was denied an Illinois law license, Smith traveled throughout Illinois and Indiana targeting black, Asian, and Jewish victims before committing suicide. Hale gave a eulogy at Smith's memorial service, a recording of which was entered into evidence at his trial. Hale told his followers that "brother Ben Smith was a very good man" and praised Smith's willingness to "take action for his people, not to sit in the easy chair and allow life to go by but to go out into the world and spread our sacred message." Responding to criticism that he had not condemned Smith's actions, Hale said:

[I]t's not the policy of the church to commit crimes but when you are causing the destruction of the white race, when you FBI, politicians, media, when you are sending the niggers into our neighborhoods, when you are letting them attack white people by the bushel, when you are

-17-

promoting the destruction of our white people left and right, do not, do not be surprised when a white man of the character and honor of Ben Smith stands up and fights back in the way he did. Do not be surprised when there are white men who say enough is enough, who see our white people be victimized in the streets, who see white women afraid to walk down the street, and who say, enough is enough. I say unto you, my brothers and sisters, the future will see more, more Ben Smiths, not because of what we've done, not because we're violent people but because, when you kick some-one around, **976** when you persecute people, when you oppress people, people will explode. And they wonder why, once again, we will not condemn Ben Smith. We cannot condemn a man for doing what he feels in his heart is right whether it's outside the tactics of the church or not.

Afterward the FBI began investigating Hale, and a cooperating witness, Tony Evola, infiltrated the World Church. At his very first World Church meeting in March 2000, Evola met Hale and apparently won his trust when he fended off a protestor. At a meeting the following month, Hale asked Evola to be his "head of security" because the previous occupier of the position, Ken Dippold, had betrayed him by cooperating in a civil case brought against the World Church seeking damages for the victims of Benjamin Smith's shooting rampage. As head of security, Evola's duties included arranging Hale's travel and standing by his side during public appearances. Evola was also in charge of the White Berets, the World Church's "elite" fighting force. During his time in Hale's employ, Evola recorded a number of conversations that were ultimately introduced into evidence at Hale's trial. The following discussion of the facts is gleaned primarily from those recordings and from electronic exchanges between Hale and Evola.

In a conversation with Evola and another follower on June 17, 2000, Hale discussed the upcoming "blitz of literature" he was organizing to commemorate the one-year anniversary of Benjamin Smith's death in the hopes of making "big news." Hale recounted Smith's shooting spree, joking that Smith's "aim got better as he went along." Hale laughed while describing in detail the first four shootings. He then commented that Smith "was a good man" and stated: "I always stand by our comrades. If people are gonna fight with me, I'm gonna stand with them." In a conversation on June 23, Hale repeated for Evola and two other followers what he had said to Benjamin Smith upon meeting him: "[W]e can accomplish a lot more peacefully and legally, you know, straddling the system, one foot on the inside, one foot on the outside .... We're legal. We're peaceful. We're non-violent but we, you know, try to undermine the system every chance we can, you know." Hale went on to say that he wished Smith "hadn't done it" but that "he set out to make a point and he did." Smith, he explained, "made us a household name" and for that reason, Hale continued, he would "always remember him and respect him and appreciate him." Hale also lamented that it was becoming more difficult to pursue his agenda peacefully and lawfully. He remarked: "[I]f I don't get my law license, I'm not going to be able to in good faith tell people to obey the law like I've been .... I'm not saying that I would ... resort to illegal acts. I'm not saying that. But I am saying that I think there's going to be a different policy in some ways." When one of his followers responded that "there's gonna be killing and there's gonna be shootin'," Hale said, "You know and I agree with you."

-18-

In a conversation on June 29, 2000, shortly after the trademark suit had commenced, Hale said of Benjamin Smith's rampage: "[I]t must have been fun while he was doing it." Hale also stated that it was "personally still [his] intention" to follow the law because he was being "watched all the time," but he would not "urge people to follow the law" as it was "up to them" to decide.

The following day, Hale left a message on his "hotline" (a voice mailbox that followers could call to hear recorded messages) announcing that the Supreme Court of the United States had declined to hear his challenge to the denial of his Illinois law license. Hale stated that he could "no *977 longer in good faith and good conscience urge, recommend, or instruct my adherents and supporters in general to obey the laws of this land." Hale declared the United States government "illegitimate" and stated that he and his followers "are free according to our own conscience to take whatever actions we deem necessary to resist this tyranny." He said that "whatever blood is spilled will be on the hands of those who so severely wronged us today" and urged his followers to "do what is right today to fight for our white race to secure the existence of our people for all time on this planet."

On December 3, 2000, Hale spoke to Evola and another follower about the civil lawsuit against the World Church arising from the Smith shootings. Hale suspected that his former security chief, Ken Dippold-whom he dubbed "a big fat coward"-would testify that Hale had orchestrated Smith's actions. Evola asked Hale, "What are we gonna do about this ... traitor?" Hale responded, "[A]ll we can do at this point is be legal and peaceful and follow the rules." But he added: "[I]f I could snap my fingers and the bastard would drop dead hideously right now, I'd do it in a heartbeat, you know, but unfortunately, it's not that easy." Later Hale remarked: "If somebody came to me and said ... I have the means to make sure that Polar Bear doesn't continue with this bullshit and I'd say hey, I don't want to know about it ... I have no legal obligation to like tell Polar Bear somebody doesn't like him."

On December 17, 2000, Evola and Hale spoke in an Internet chatroom. Evola asked Hale if he had considered Evola's prior disclosure that he had a cousin who could take care of "the rat." Hale replied, "Of course, it is very important that I be able to say truthfully that I have never advocated anything illegal," and later he elaborated: "I know that it should be legal to dispose of big rats. So I wouldn't mind if something happens to big rats .... But I would never want to involve myself in such things."

On January 11, 2001, Evola recorded a conversation with Hale at Hale's father's home (the headquarters of the World Church). Evola told Hale that "everything's in motion" and that he needed a picture or an address to give to his cousin's "friends." Hale responded, "I think it would be best, you know, I think it would be best that nothing happened." Evola protested, and Hale explained that

-19-

Dippold had "already been deposed" so killing him would not help their litigation position and would only draw suspicion. Hale added that he was close to getting a law license in Iowa and did not want to jeopardize his chances with negative publicity because the World Church would "automatically" be blamed. Evola persisted but Hale was firm: "I'm gonna have to say no to this and I have to say no for a number of reasons." Evola offered to provide Hale with an alibi for the murder, and Hale declined because "what I would be doing or what I would be authorizing would be grounds for disbarment if I had a license and I just hate to go [sic] that." Evola told Hale that "bad things happen to people all the time" and implored that "all I need is an address." At that point Hale stated he already had mailed the address to Evola "just for your information only." Hale expressed concern that "it might hurt us" and reiterated: "I just want it clear. I've never given my authorization for this." Again Evola said he just needed the address, and Hale replied it had been sent "just because you happen to have other addresses." Evola asked questions about the layout of Dippold's apartment, and Hale answered that he couldn't "go into" anything like that because "I can't further this." After more talk about his upcoming hearing before representatives of the Iowa **978 bar, Hale said they were "speaking in theoretical terms" and he didn't "want to know about these things." The men discussed other subjects until Evola returned to the subject of Dippold. Hale stated, "I just want to say that I can't approve," and later he was emphatic: "I don't want to ever hear about it again." The next day Hale sent an email to Evola about the "idea" and stated, "I must veto it." Hale wrote, "You are very persuasive and obviously I think extremely well of you for your idea," but he concluded, "I must instruct you not to proceed."


In another online chat in August 2001, Hale told Evola that a church member, Dan Hassett, was attempting to remove Hale from his position as Pontifex Maximus. Evola wrote, "Maybe he has to go?" but Hale did not respond. In November, Hale forwarded to Evola an abrasive email received from former church member Pat Langballe and asked Evola to "persuade him to never say such sick crap to me again." In December, Evola offered to do to Langballe what "we were gonna do to Dippold," but Hale declined, suggesting instead that Evola should just scare Langballe into treating him with more respect. Later in the conversation, Hale stated, "I have to be able to take a polygraph if ever it comes up and pass it, if I'm ever asked if I have ever ordered, instructed, or encouraged illegal activity, I want to be able to pass that polygraph." In May 2002, as the discord between Hale and Hassett escalated, Evola once again asked Hale "what you want done with him," and Hale explained that he had reported Hassett to the police for stealing funds from the church and hoped he would be arrested.


All this was a prelude to the events of late 2002 leading to Hale's arrest. In November, after Judge Lefkow issued the order requiring the World Church to cease using its trademarked name, Hale penned a tract entitled "Rigged Court System Declares War on Church" and sent it to his followers. Hale wrote that the order "places our Church in a state of war with this federal judge and any acting on authority of her kangaroo court." Hale branded the mandate a "book burning order," suggesting to his followers that all World Church literature-including their guiding light, *The White Man's Bible*-would have to be destroyed. Though the World Church was represented by counsel, Hale

personally sent a letter to Judge Lefkow on December 12, 2002, complaining that "gross injustice" and "fraud" had occurred in the case. He also wrote that he was no longer in control of World Church activities, and that "from [his] understanding of the Court's order [he had] no material in [his] control or possession that falls afoul of it."

On December 4, 2002, just days after Hale disseminated his manifesto, he emailed Evola and asked him to locate the home address of "Judge Joan H. Lefkow, PROBABLE JEW OR MARRIED TO JEW," as well as the home addresses of the three attorneys, all male, who represented the Foundation in the trademark case. Hale labeled two of the lawyers "JEW" and the other "TRAITOR WHITE." He concluded the message by stating: "Any action of any kind against those seeking to destroy our religious liberties is entirely up to each and every Creator according to the dictates of his own conscience."

On December 5, Evola went to Hale's home unannounced to discuss the email "about the Jew judge" and, in particular, Hale's request to locate her home address:

*Hale*: That information, yes, for educational purposes and for whatever reason you wish it to be.
*Evola*: Are we gonna ... I'm workin' on it. I, I got a way of getting it.  **\*979** Ah, when we get it, we gonna exterminate the rat?
*Hale*: Well, whatever you wanna do...
*Evola*: Jew rat?
*Hale*: ... basically, it's, you know? Ah, my position's always been that I, you know, I'm gonna fight within the law and but ah, that information's been pro-, provided. If you wish to, ah, do anything yourself, you can, you know?
*Evola*: Okay.
*Hale*: So that makes it clear.
*Evola*: Consider it done.
*Hale*: Good.

Hale asked Evola to send him the address once he learned it so that Hale could post it on the Internet.

On December 9, Evola sent an email to Hale announcing:

I called the exterminator I know about the rat problem we talked about. The guy is good and does a good quiet job. You have to know where rats hide and he think [sic] he located her. He is working to get rid of the femala [sic] rat right now.

Hale did not reply, but an electronic receipt confirms that he opened the message.

On December 17, Evola appeared unannounced at Hale's home to discuss the plan. Hale did not want to discuss the matter because he assumed that he was "always being listened to, watched, monitored." When Evola mentioned "exterminating the rat," Hale answered, "I can't be a party to such a thing" and lamented that Evola was putting him "in an impossible situation." Hale expressed his concern that "there's a federal statute that makes it ... an imprisonable offense to know about a crime that's to be occurred ... without telling anybody." Evola stated that the plan was already in motion and that it was costing him more than he expected; he asked Hale if there were "two trusted brothers that could help out with this." Hale responded, "I can't take any steps to further anything illegal, ever." Evola then asked if he could stay with Hale "when this stuff does come to happen," and Hale refused, explaining that he was concerned about being considered "some kind of accessory in something I do not want to be an accessory in." Hale later stated: "I'm not telling you to do anything, you know. Either way." "[W]hatever a person does," he added, "is according to the dictates of their own conscience." Evola again alluded to compensating the assassins and mentioned being "a couple hundred short." Hale responded, "I just can't provide anything." Hale stated that he might "have a smile on his face" if he were to read in a newspaper that "something happens to certain creepy people" but that he could not "be any kind of party." When Evola discussed the trustworthiness of "his cousin's friends," Hale replied, "[O]f course, we're talking about Little League baseball, aren't we?" Hale asked Evola not to turn up unannounced at his home again.

Hale was arrested in Chicago on January 8, 2003, when he appeared for a contempt hearing for his refusal to comply with Judge Lefkow's order in the trademark case. Pursuant to a third superceding indictment filed in October 2003, he was charged with three counts of obstructing justice, **18 U.S.C. § 1503**, and two counts of soliciting a crime of violence, *id.* **§ 373**. The latter counts separately charged Hale with soliciting Tony Evola and another follower named Jon Fox to murder Judge Lefkow. The obstruction charges concerned (1) Hale's letter of December 12, 2002, falsely advising Judge Lefkow that he possessed no materials that violated the court's order; (2) his attempts to thwart Judge Lefkow in the discharge of her duties by soliciting her murder; and (3) his alleged directives to his father to lie to the grand jury.