# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

**UNITED STATES OF AMERICA**
       **Plaintiff,**

   **v.**                                  **Case No. 08-CR-851**

**WILLIAM WHITE**
         **Defendant.**

## DECISION AND ORDER

In 2003, a jury in the Northern District of Illinois convicted white supremacist leader Matthew Hale of soliciting the murder of District Judge Joan Lefkow, who had presided over a civil case involving Hale's organization, the World Church of the Creator. The district court sentenced Hale to 480 months in prison, and the Seventh Circuit affirmed Hale's conviction and sentence on direct appeal. See United States v. Hale, 448 F.3d 971 (7th Cir. 2006).

In 2008, Hale filed a motion challenging his conviction and sentence on various grounds, including the alleged ineffectiveness of his trial counsel. Among other errors, Hale alleged that his lawyer botched jury selection, failing to challenge or strike a juror named Mark Hoffman, a gay man with an African-American partner who ended up serving as the jury foreperson. On September 11, 2008, after an article about Hale's motion appeared in the Chicago Sun-Times, defendant William White (hereafter "defendant"), also a white supremacist and the leader of an organization called the American National Socialist Workers Party ("ANSWP"), posted an article about Hale's motion on his website, Overthrow.com. The article was entitled "Hale Seeks To Have Sentence Overturned," with the sub-headline "Gay Jewish Anti-Racist Led Jury." (Govt. Ex. 2 at 1.) Below the headline, defendant posted Hoffman's picture with the caption:

> Gay Jewish anti-racist Mark P Hoffmann was a juror who played a key role in convicting Hale. Born August 24, 1964, he lives at 6915 HAMILTON #A CHICAGO, IL 60645 with his gay black lover and his cat "homeboy". His phone number is (773)274-1215, cell phone is (773)426-5676 and his office is (847) 491-3783.

(Govt. Ex. 2 at 1.) Defendant also displayed Hoffman's picture and the above caption on the blog section of the website. (Govt. Ex. 1.) The following day, after Hoffman's employer removed the picture to which defendant had linked, defendant posted a "Mark P Hoffman Update," with the sub-heading, "Since They Blocked the First Photo." (Govt. Ex. 4 at 1.) The post contained the same photo and caption, with the additional text: "Note that Northwestern University blocked much of Mr. Hoffman's information after we linked to his photograph." (Govt. Ex. 4 at 1.)

Based on these posts, the government charged defendant with soliciting or otherwise endeavoring to persuade another person to injure Hoffman based on his jury service in the Hale case, in violation of 18 U.S.C. § 373. Section 373(a) provides:

> Whoever, with intent that another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, solicits, commands, induces, or otherwise endeavors to persuade such other person to engage in such conduct, shall be imprisoned not more than . . .

18 U.S.C. § 373.

I dismissed the indictment on the ground that it failed to allege a solicitation and as contrary to the First Amendment, but the Seventh Circuit reversed, finding that I acted prematurely, and remanded the case for a trial at which the context of the posts could be considered. United States v. White, 610 F.3d 956 (7th Cir. 2010). The Seventh Circuit acknowledged that the case presented important First Amendment issues and stated that after

the government produced its evidence, "the court may decide that a reasonable juror could not conclude that White's intent was for harm to befall [Hoffman], and not merely electronic or verbal harassment." Id. at 962.

I granted the government's motion to try the case to an anonymous jury, which returned a verdict of guilty. Before me now is defendant's motion for acquittal under Fed. R. Crim. P. 29. For the reasons that follow, and based on the entire trial record, I find that the government failed to present sufficient evidence to enable a reasonable juror to conclude either that defendant's posts regarding Hoffman constituted a solicitation to harm Hoffman, or that defendant intended the posts to solicit harm to Hoffman. I further find the posts protected by the First Amendment. Accordingly, I grant defendant's motion.

## I. BACKGROUND AND FACTS

### A.    Procedural History

The government originally indicted defendant in October 2008, alleging that through the posts quoted above he solicited another person to harm "Juror A," the Hale jury foreperson. As circumstances "strongly corroborative" of defendant's intent that another person harm Juror A the indictment alleged that when he posted these statements defendant was aware that white supremacists, Overthrow.com's target audience, sometimes committed acts of violence against non-whites, Jews, homosexuals, and others perceived as acting contrary to the interests of the white race. The indictment further alleged that before posting the statements, defendant displayed on Overthrow.com other posts, some of which were still available, containing the home addresses of individuals he criticized on the website, and that in some of these posts defendant expressed a desire that these individuals be harmed. The indictment then listed

various examples of such posts.

On February 10, 2009, the government obtained a superseding indictment, which tracked the original indictment but also referred to additional posts allegedly corroborative of defendant's intent that Juror A be harmed, including posts regarding the 2005 murders of Judge Lefkow's husband and mother and an e-mail listing the home address of various federal prosecutors, agents, and others involved in the Hale matter that had been circulating among white nationalist discussion groups.

After the government filed the superseding indictment, defendant moved to transfer the case to a federal court in Virginia (where the government had charged him, in a separate matter, with interstate transmission of threatening communications); to recuse the judges in the Northern District of Illinois based on the references to the Lefkow murders; and to disqualify the United States Attorney's Office in the Northern District of Illinois. The court granted the motion to recuse, and the case was re-assigned to me. I denied defendant's motions to transfer and to disqualify the prosecutors, and authorized defendant to file additional motions relating to the superseding indictment. Defendant subsequently filed motions to exclude certain evidence under Fed. R. Evid. 403 and 404(b), to strike surplusage from the indictment, and to dismiss the indictment on various grounds, including the First Amendment. For its part, the government moved to empanel an anonymous jury at trial.

As indicated above, I granted defendant's motion to dismiss the superseding indictment, holding that defendant's speech, as alleged in the indictment, was protected by the First Amendment and did not state a violation of § 373. United States v. White, 638 F. Supp. 2d 935 (N.D. Ill. 2009). I noted that defendant's posts regarding Juror A did not expressly solicit or seek to persuade another person to harm Juror A; rather, they disclosed personal information

4

and commented on his sexual orientation and attitude toward race.  I further noted that while the posts could reasonably be read as criticizing Juror A's vote to convict Hale, the Supreme Court has long held that scrutiny and criticism of people involved in criminal cases, which may include the disclosure of personal information about them, is protected by the First Amendment. Id. at 944-45 (citing The Florida Star v. B.J.F., 491 U.S. 524 (1989); Globe Newspaper Co. v. Superior Court for Norfolk County, 457 U.S. 596 (1982); Smith v. Daily Mail Publishing Co., 443 U.S. 97 (1979); Wood v. Georgia, 370 U.S. 375 (1962)).  Finally, I concluded that the other circumstances listed in the indictment, including defendant's other posts and his awareness that white supremacists (the website's target audience) sometimes committed acts of violence against alleged enemies of the white race, could not transform defendant's lawful statements about Juror A into a criminal solicitation.  I rejected the government's suggestion that simply because defendant had previously disclosed personal information about individuals and expressed a wish that they be harmed, his lawful statements about Juror A could be found to be a violation of § 373.  Id. at 945-46.

In reversing, the Seventh Circuit found the indictment legally sufficient under Fed. R. Crim. P. 7, as it tracked the language of the charging statute, listed each element of the crime, provided corroborating circumstances of defendant's intent, and made defendant aware of the specific conduct against which he had to defend himself at trial.  Id. at 959.  The court then turned to the constitutional question, stating that any "potential First Amendment concern is addressed by the requirement of proof beyond a reasonable doubt at trial, not by a dismissal at the indictment stage."  Id.  The court noted that in the case of a criminal solicitation, the speech – asking another to commit a crime – is the punishable act.  The court explained that solicitation is an inchoate crime; the crime is complete once the words are spoken with the

requisite intent, and no further actions from either the solicitor or solicitee are necessary. Nor, the court noted, is a specific person-to-person request required. Id. at 960. The court further noted that a request for criminal action can be coded or implicit. Id. at 961.

> The court concluded that:
>
> White's argument boils down to this: his posting was not a solicitation and because it is not a solicitation, it is speech deserving of First Amendment protection. The government sees the posting in the opposite light: the posting and website constitute a solicitation and as such, fall outside the parameters of First Amendment protection. This dispute turns out not to be an argument about the validity of the indictment in light of the First Amendment, but is instead a dispute over the meaning and inferences that can be drawn from the facts. The government informed us at oral argument that it has further evidence of the website's readership, audience, and the relationship between White and his followers which will show the posting was a specific request to White's followers, who understood that request and were capable and willing to act on it. This evidence is not laid out in the indictment and does not need to be. The existence of strongly corroborating circumstances evincing White's intent is a jury question. Of course, the First Amendment may still have a role to play at trial. Based on the full factual record, the court may decide to instruct the jury on the distinction between solicitation and advocacy, and the legal requirements imposed by the First Amendment. See, e.g., United States v. Freeman, 761 F.2d 549, 552 (9th Cir. 1985).

Id. at 962 (internal citations omitted).

## B.    The Trial

The government's first witness was FBI Agent Sara Lopez, who provided background on the Hale case. Lopez testified that in July 1999, while assigned to a domestic terrorism unit which investigated white supremacists, she acted as the case agent in the investigation of a series of shootings committed by a member of Hale's organization, Ben Smith, in which Smith wounded nine people and killed two. All of Smith's victims were Jewish, African-American, or Asian. (Trial Tr. at 44-48.) Lopez testified that Smith belonged to the World Church of the Creator, which Hale ran out of his father's residence in East Peoria, Illinois. (Tr. at 49.)

6

Following Smith's death in a shoot-out with law enforcement, Lopez investigated Hale's group, learning that Hale obtained a law degree but had been denied a law license by the State of Illinois on June 30, 1999, days before Smith commenced his shooting spree. (Tr. at 50-51.) Lopez testified that through her experience investigating white supremacist groups she learned of the concept of "lone wolf activism," pursuant to a person is motivated to individually commit criminal acts based on something he has heard or seen. (Tr. at 52.) Lopez developed no evidence that Hale or other members of his group participated directly in the Smith shootings. (Tr. at 55.) Agents continued their investigation, however, developing a confidential informant, Tony Evola, to keep tabs on Hale. Evola, who acted as Hale's head of security, accompanying him to meetings in and out of Illinois, agreed to provide information, at times wearing a wire and recording conversations. (Tr. at 55-56.)

In May 2000, a group called the TE-TA-MA Foundation, which also called itself the Church of the Creator, filed a civil suit in the Northern District of Illinois against Hale and his organization, requesting that Hale cease using the "Church of the Creator" name. (Tr. at 57.) In June 2002, Judge Lefkow ruled in favor of Hale, but in August 2002 the Seventh Circuit reversed and directed Judge Lefkow to rule in favor of TE-TA-MA. (Tr. at 58-59.) On November 19, 2002, Judge Lefkow entered judgment against Hale. Hale refused to comply with the order, and Judge Lefkow issued an order finding him in contempt, setting a hearing for January 8, 2003. Between November 19, 2002, and January 8, 2003, Hale solicited Evola to commit a violent act against Judge Lefkow. Specifically, on December 4, Hale e-mailed Evola, asking Evola to locate Judge Lefkow's home address, and on December 5, Evola and Hale discussed "exterminat[ing] the rat," code for killing Judge Lefkow. (Tr. at 50-60, 74.) As a result of those conversations, on January 7, 2003, Hale was indicted for soliciting the murder of Judge

Lefkow.  (Tr. at 60-61, 74.)

Hale went to trial on April 7, 2004.  One of the jurors selected was Mark Hoffman, who ended up being the foreperson.  On April 26, 2004, the jury convicted Hale.  (Tr. at 62.)  The day Hale was convicted, defendant posted what purported to be Tony Evola's address and phone number on Overthrow.com.  (Tr. at 63.)  However, the address turned out to be for a different person, Antonio Evola.  (Tr. at 64, 76.)  No charges were filed against defendant related to that posting.  (Tr. at 76-77.)  Nor did the investigation reveal that defendant was involved with Hale between 2002 and 2005, or that he had anything to do with Ben Smith.  (Tr. at 78-79.)

On February 28, 2005, Judge Lefkow's husband and mother were killed.  (Tr. at 67.)  Lopez, again acting as the case agent, investigated whether someone involved in Hale's group was responsible, but the investigation revealed that the murders were committed by a man named Bart Ross, a disgruntled litigant, and had nothing to do with Hale.  (Tr. at 68, 70, 77.)  Hale was sentenced in April 2005.  (Tr. at 67.)

On September 11, 2008, Lopez received a call from Hoffman, after which she viewed defendant's website, Overthrow.com, where she saw the post relating to Hoffman.  (Tr. at 70-72.)  Lopez testified that Hoffman's identity as one of the Hale jurors was public knowledge.  (Tr. at 79-80.)

The government next called FBI Special Agent Paul Messing, a member of the Richmond, Virginia Computer Analysis Response Team ("CART"), which performed computer forensic analysis on digital media seized by the FBI.  (Tr. at 80-81.)  Messing testified that in October 2008 he assisted in two searches of properties associated with defendant in Roanoke, Virginia, pursuant to which agents seized a variety of items, including the server/computer used

8

to run Overthrow.com. (Tr. at 85-88.) Messing further determined that the Hoffman post was created on a computer seized from defendant's home. (Tr. at 97.) The government also presented a stipulation that, if called to testify, FBI Agent David Church would testify that on October 27, 2008, he spoke to defendant, and defendant indicated that he runs Overthrow.com and made the postings related to Mark Hoffman. (Tr. at 102-03.) Messing testified that prior to sending a copy of the seized materials to agents in Chicago he installed software called Forensic Tool Kit ("FTK"), which would enable them to search for specific articles and words on Overthrow.com. (Tr. at 99-100).

The government then called John Dziedzic, an officer with the Cook County Sheriff's Department and member of the Chicago Regional Computer Forensics Laboratory ("RCFL"). (Tr. at 103-04.) Dziedzic testified that he verified the existence of various posts/articles, marked as government exhibits 1-35 at trial, on the server processed by Special Agent Messing. (Tr. at 106-07.) He further testified that, if the server were plugged into the internet, all of those articles would be available to an internet user who visited Overthrow.com. (Tr. at 107-08.)

The government next called Hoffman, who testified that he moved to Chicago with his life partner in 1999, taking a job at Northwestern University. (Tr. at 117-19.) Hoffman indicated that after the Ben Smith shootings Hale wanted to come to the Northwestern campus to speak, leading to student protests, one of which he attended in his capacity as an Associate Dean of Students. The University ultimately decided not to allow Hale to speak. (Tr. at 120-21.)

Hoffman testified that in April 2004 he was summoned for jury duty and ended up serving on the Hale trial. (Tr. at 121-22.) During voir dire, Hoffman disclosed his knowledge of Hale but indicated that he could be objective. (Tr. at 122-23.) He also disclosed his relationship with an African-American man. (Tr. at 124.) Nevertheless, he was selected as a juror. (Tr. at 125.)

9

The next day, an article appeared in the newspaper identifying one of the Hale jurors as an Assistant Dean at Northwestern, which caused Hoffman to worry about his safety; he removed the sign from his door and the message on his voice-mail saying he was "out for jury duty." (Tr. at 126.) At the conclusion of the trial, which lasted about a week and a half, the jurors retired to deliberate and selected Hoffman as the foreperson. (Tr. at 127-28.) Hoffman testified that after they returned a guilty verdict, the jurors were escorted out of the building by the United States Marshal Service through a tunnel, popping up a block and a half away, so they did not have to go out the front entrance because of the press. (Tr. at 129-30.) Hoffman testified that on September 11, 2008, at about 9:30 a.m. he received a call on his cell phone from a Virginia number. (Tr. at 134, 171.) The male caller asked if he was Mark Hoffman; Hoffman said yes. The man asked if his date of birth was August 24, 1964, and Hoffman asked who was calling. The man then asked if his address was 6915 North Hamilton,[1] and Hoffman asked what this was regarding. The man then asked if he was on the jury that convicted Matthew Hale. Hoffman either said he didn't remember or didn't know. The man said, "that's all I need to know" and hung up. (Tr. at 134, 171-73.) The caller did not threaten Hoffman. (Tr. at 173.)

Hoffman testified that he immediately contacted Northwestern security and Agent Lopez. About ½ hour later, he began receiving text messages on his cell phone, saying things like "sodomize Obama, Bomb China, kill McCain, cremated Jews, all these really upsetting things." (Tr. at 135.) Hoffman indicated that he kept receiving text messages and broke down crying because he thought someone was coming after him. (Tr. at 135.) However, he admitted that

---

[1]Hoffman testified that this was his previous address. (Tr. at 133-34.)

none of the texts threatened his life; none said "I'm coming to get you"; and none were even directed towards him. (Tr. at 174-75.)

After speaking to his partner, who calmed him down, Hoffman, who had become a part-time law student after the Hale trial, went to his law school library to study. At about 2:00 or 3:00 p.m., he received an e-mail from a friend stating that he could do a "reverse lookup in Google." He typed in his cell number and "all of a sudden what popped up was a picture of me on overthrow.com, a white supremacist website." (Tr. at 136.) The text messages continued for a few days. (Tr. at 140.) Again, though, Hoffman testified that none of the texts he saw threatened him; nor were any threats later brought to his attention. (Tr. at 175.)

The government then introduced the three Overthrow.com posts pertaining to Hoffman. The first appeared as part of the article defendant wrote discussing Hale's post-conviction motion challenging his conviction based on Hoffman's service on the jury. The article was entitled "Hale Seeks To Have Sentence Overturned. Gay Jewish Anti-Racist Led Jury." (Govt. Ex. 2 at 1.) Below the headline and byline (9/11/2008 10:52 AM, Overthrow Staff), was a picture of Hoffman, with the caption:

> Gay Jewish anti-racist Mark P Hoffmann was a juror who played a key role in convicting Hale. Born August 24, 1964, he lives at 6915 HAMILTON #A CHICAGO, IL 60645 with his gay black lover and his cat "homeboy". His phone number is (773)274-1215, cell phone is (773)426-5676 and his office is (847) 491-3783.

(Govt. Ex. 2 at 1; Tr. at 142.)[2] The article then proceeded to discuss Hale's motion, stating:

---

[2]The photo displayed as part of this post came from Hoffman's bio on the Northwestern website. (Tr. at 152, 176.) Asked how defendant could have learned his cat's name, Hoffman testified that he wrote on the Northwestern web page that he lived in West Rogers Park with his life partner, and that they had a cat, Homeboy. (Tr. at 151, 163-64.) Hoffman also testified that the Northwestern website listed his office and cell phone numbers. (Tr. at 162, 180.) Hoffman further testified that his name and sexual orientation were publicly disclosed during

A white leader wrongfully imprisoned on charges of "conspiring" to kill a federal judge may have his forty year prison sentence reduced if an Illinois judge assigned the task of reviewing the qualifications of his jurors finds impropriety in their selection.

According to a motion put forward by Matt Hale yesterday in federal court, a gay Jewish Assistant Dean at Northwestern University, Mark P Hoffmann, who has a gay black lover and ties to professional anti-racist groups, and who also personally knew a Northwestern University basketball coach killed by Ben Smith, a follower of Hale, was allowed to sit on his jury without challenge and played a leading role in inciting both the conviction and the harsh sentence that followed.

Hoffman, who was elected jury Foreman and who led the conviction of Hale, lives in West Rogers Park with his gay black lover and his cat, "Homeboy".

The motion also asserts that Hale's counsel at trial, Thomas Anthony Durkin, failed to put on evidence that Hale had praised Judge Joan Lefkow, referred to her as an "ally" of the cause, and had referred to Jewish attorney James Amend as a "Jew rat" he would like to "exterminate", not Lefkow.

Hale also states that his attorney failed to challenge a government search warrant, stipulated to the accuracy of an inaccurate transcript, and put on evidence designed to convict Hale.

It has long been believed among white organizations that Durkin was bribed by Jewish groups or the federal government into deliberately sabotaging Hale's case.

Hale was accused of conspiring with a federal informant, Tony Evola, to murder Judge Lefkow, who had been hearing a copyright infringement case against Hale.

However, during the trial, it came out that Hale did not conspire with Evola, but when Evola, at the instruction of the FBI, had tried to solicit the assassination of Lefkow, Hale had responded by saying that he didn't care what Evola did one way or another.

Hale has appealed and sought a reduction of his criminally long sentence since the trial, without avail, but his latest appeal may overturn the court's decision.

---

the Hale trial; Hale also mentioned those facts in his post-conviction motion.  (Tr. at 166-67.) Hoffman also disclosed the race of his partner during the trial.  (Tr. at 167.)  Hoffman could not recall whether his home phone number was listed in the white pages (or listed under his name or his partner's) (Tr. at 165), but he did testify that the press called him on his home phone after the Hale trial, indicating that the number was publicly available (Tr. at 168).

A cryptic article in the Chicago Sun-Times refused to identify which court Hale had filed his appeal in or any details of the case, but documents filed in Illinois District Court Civil 1:08-cv-00094 by his attorney, Clifford J. Barnard, document Hale's claims.

(Govt. Ex. 2 at 1-2.)[3]  The article ended with the notation:

Emailed to you by:

Overthrow.com
ATTN: Bill White, Editor

(Govt. Ex. 2 at 2.)

Hoffman testified that the first phone number listed in the caption about him (the 274 number) was his phone number when he lived at the Hamilton address, but he had moved from there about a year before.  (Tr. at 143.)  The cell number listed was his actual cell phone number, as was the office number listed.  Regarding the balance of the caption, Hoffman indicated that he was not Jewish, and that his name was not spelled with a double "n."  (Tr. at 143-44.)

On the left hand side of the Hoffman post were links to other articles referred to as "Top Articles (2008)", the first of which was entitled "Nigger Candidate Comes Out Against The Constitution."  (Govt. Ex. 2 at 1; Tr. at 146.)  Article number 11 on the list was entitled "Kill Richard Warman."  (Govt. Ex. 2 at 2; Tr. at 146-47, 320.)  Also to the left of the Hoffman post was a depiction of the cover of "National Socialist" magazine, which bore a picture of then-presidential candidate Barack Obama with crosshairs over his head and bearing the title: "Kill

--------------------

[3]Hoffman testified that he later learned that an article appeared in the Chicago Sun-Times, the same day as the first Overthrow.com post about him, discussing Hale's court filing about the foreman of the jury.  Specifically, the Sun-Times article indicated that Hale sought a new trial based on information about the foreman's sexuality and issues of race.  (Tr. at 169-71.)

This Nigger?  Negro Deification And the 'Obama Assassination' Myth."  (Govt. Ex. 2 at 1; Tr. at 147.)  Hoffman testified that if you clicked on the Obama picture you were taken "further back into the website to additional materials," including a portion of the "official Blog of Overthrow.com."   (Tr. at 148; Govt. Ex 1.) That portion of the site also contained a post entitled, "The Juror Who Convicted Matt Hale."  Below the same picture of Hoffman, the post included the same information:

> Gay Jewish anti-racist Mark P Hoffmann was a juror who played a key role in convicting Hale.  Born August 24, 1964, he lives at 6915 HAMILTON #A CHICAGO, IL 60645 with his gay black lover and his cat "homeboy".  His phone number is (773) 274-1215, cell phone is (773) 426-5676 and his office is (847) 491-3783.

(Govt. Ex. 1 at 1; Tr. at 148.)  Following a post about defendant's appearance on a Columbia, South Carolina radio show (Govt. Ex. 1 at 1-2), the blog section contained a post entitled, "'Kill This Nigger – Obama Assassination Magazine," followed by another photo of the magazine's cover and a statement that the American National Socialist Workers Party was seeking donors to help them raise money to print 20,000 copies of the new magazine:

> for distribution in certain "swing markets" just prior to the November election.

> The controversial cover for a story on "Negro Deification And The 'Obama Assassination' Myth", looks at the role of Barack Obama's radical communist politics and Jewish backers have played in making his electoral career and how he plans genocide against white working people.

> The article also looks into the phony "Obama assassination" conspiracies that have circulated in the Jewish press, and how major Jewish newspapers, like the Washington Post, tried to promote white supremacist opposition to Obama through planted and staged newspaper articles.

> The ANSWP will print 10,000 copies of a 12-page magazine if it receives $3800 by October 1st, and will print 20,000 copies of a 16-page magazine if it receives $10,000 by that time.  (20,000 copies of a 12-page magazine will run about $7,000 - $7,500).

Those willing to contribute to this project should send donations to:

ANSWP
PO Box 8601
Roanoke, VA 24014

As little as ten donors putting up $380 each, or twenty donors contributing $190, will make this project happen.

(Govt. Ex. 1 at 2-4.)

This section of the blog contained various other stories, followed by links to "White Blogs." (Govt. Ex. 1 at 4-11; Tr. at 149.) At the end was a "Recent Comments" section, which included two comments about the Hoffman post, one stating "This is why I advocate every white racist/realist/nationalist register to vote so . . ." and the other stating: "Wanna take bets on how quick his cell phone turns off/number changes? My bet is by at least 5pm." (Govt. Ex. 1 at 11; Tr. at 150.) Hoffman testified that he initially refused to change his number but decided to do so about a week later after he got a disturbing phone call.[4] (Tr. at 150, 154.)

Hoffman testified that after he saw these posts he had Northwestern remove all of his identifying information from its website. (Tr. at 150.) The school's IT people replaced Hoffman's photo with a picture of a swastika in a red circle with a slash through it, which then appeared on the Overthrow.com web page. (Tr. at 152.) However, the next day, September 12, 2008, at about 6:21 p.m., a new post appeared on Overthrow.com, entitled: "Mark P Hoffman Update," with the sub-heading, "Since They Blocked the First Photo." (Govt. Ex. 4 at 1.) The post contained the same photo of Hoffman, with the text:

---

[4]Hoffman testified that the caller left a voice mail, stating "hey, you fuckin' Jew bastard, are you too busy fucking your nigger buddy, pick up the phone." (Tr. at 154, 175.) Hoffman testified that he never received a message that someone was coming to kill or hurt him. (Tr. at 175-76.)

> Gay Jewish anti-racist Mark P Hoffman was a juror who played a key role in convicting Hale. Born August 24, 1964, he lives at 6915 HAMILTON #A CHICAGO, IL 60645 with his gay black lover and his cat "homeboy". His phone number is (773) 274-1215, cell phone is (773) 426-5676 and his office is (847) 491-3783.
>
> Note that Northwestern University blocked much of Mr. Hoffman's information after we linked to his photograph.

(Govt. Ex. 4 at 1; Tr. at 152-53.) On the left hand side, the site again contained links to the top articles of 2008 and a picture of the Obama magazine cover. (Govt. Ex. 4 at 1; Tr. at 153.)

The government obtained a copy of the magazine, which also contained an article about Hoffman, entitled "Hale's Jew-ror." (Govt. Ex. 5 at 4-6; Tr. at 156-58.)[5] The article began:

> Mark P Hoffman is typical of the trash you might see carrying signs and throwing urine bags at a local rally against "racism," "sexism," or "homophobia". A former professor at Chicago's Northwestern University who lives at 6915 Hamilton #A in Chicago, Illinois, 60645, he's a homosexual Jew with a black lover and a cat named "homeboy." You can call him at (773) 274-1215, cell phone is (773) 426-5676 and his office is (847) 491-3783.
>
> If that was all that Hoffman was – another anonymous voice in a dirty Jewish mob, screaming for blood and for the further impoverishment of the white worker – he would hardly be of note. But Hoffman is something more – he was not only a juror at the nationally publicized trial of Matt Hale, but the jury foreman, and the architect of both Hale's conviction and his extreme and lengthy forty year sentence.

(Govt. Ex. 5 at 6.) The article then discussed suspicions that Hale's lawyer threw the case and may have been bribed, other issues at Hale's trial, and Hale's recent court filing challenging Hoffman's service on the jury. (Id.)

Nowhere in any of the Overthrow.com posts or the magazine article did defendant call for anyone to kill or hurt Hoffman, his life partner, or his cat. (Govt. Ex. 1, 2 & 4; Tr. at 181, 183, 185-86, 190.) Hoffman testified that from September 11, 2008, the date of the first post, to the

---

[5]It is unclear whether the magazine was ever distributed to others. (Tr. at 284.)

date of defendant's trial, no one threatened to kill him, showed up at his house, stalked him, or physically harmed him in any way. (Tr. at 190-91.)

The government next called FBI Special Agent Maureen Mazzola, who acted as the case agent in defendant's prosecution. (Tr. at 196-97.) Mazzola testified that as part of her investigation she obtained phone records for Mark Hoffman's cell phone and the cell phone of Megan White, defendant's wife, which reflected a call from Megan White's phone to Hoffman's on September 11, 2008, at 10:34. (Tr. at 201-02.) Mazzola further testified that as part of her investigation she reviewed the Overthrow.com website in great detail. (Tr. at 202.) The government then introduced through Mazzola various older posts, marked as exhibits 1-35,[6] from the Overthrow.com server. (Tr. at 202-03.) In these posts, defendant displayed what purported to be the addresses of the "Jena Six," a group of black teens accused of beating a white boy (Govt. Ex. 8, 10), along with an article entitled "Lynch The Jena Six" (Govt. Ex. 35); discussed an attack on Holocaust survivor and author Elie Wiesel by a white supremacist named Eric Hunt and displayed addresses for Wiesel "in case anyone was looking for him" (Govt. Ex. 9); excoriated Canadian civil rights lawyer Richard Warman, posting what purported to be Warman's address and stating that Warman "should be drug out into the street and shot, after appropriate trial by a revolutionary tribunal of Canada's white activists" (Govt. Ex. 11, 18, 19); discussed the murders of Judge Lefkow's husband and mother, which defendant considered "justice" (Govt. Ex. 13-15); mentioned an e-mail allegedly containing the home addresses of other persons involved in the Hale case circulating among white nationalist

_____

[6]Exhibits 1-35 were not sequential; certain numbers were skipped. (Tr. at 203.) For the reader's convenience, rather than detailing all of these posts in the body of the opinion, I have placed them in the appendix to the decision.

discussion groups, but which defendant declined to republish because "we feel there is so great a potential for action . . . at this time" (Govt. Ex. 16); discussed an attack on the former home of an individual who allegedly cooperated with federal authorities against a white supremacist named Jake Laskey (Govt. Ex. 23); displayed the home address and phone number of newspaper columnist Leonard Pitts after Pitts wrote a column defendant did not like (Govt. Ex. 30), and which he refused to remove upon the request of Pitt's editor, stating "if some loony took the info and killed him, I wouldn't shed a tear" (Govt. Ex. 31).

Mazzola, who viewed Overthrow.com when it was "live" on the internet, testified that a user who visited the website on September 11, 2008 would first see the Hoffman post, exhibit 2. (Tr. at 287, 296.) However, such a user would not immediately see the other articles introduced by the government; he would have to click on a link or otherwise visit another portion of the site to reach those articles. (Tr. at 287-88, 290, 295, 301, 303.) To find a particular article, the user would have "to be either looking for it or reading every single article on the website." (Tr. at 292.) And if one clicked on a link to another article, Hoffman's information would disappear and no longer be on the same page.[7] (Tr. at 297, 299, 312.) Mazzola testified that she went through a "fair number" of the articles on the site prior to trial and picked the ones that would be presented to the jury. (Tr. at 292-93.) She stated that it was not difficult for her to find what she was looking for on the site. (Tr. at 321.) However, in locating specific posts

_____

[7]Once the user clicked on the link, the older article would appear, but the left side of the screen – where, as depicted in several of the exhibits, the "Obama assassination" magazine appeared – might remain the same (Tr. at 288); on some of the exhibits, however, the left side of the screen was different, i.e. it depicted a different cover of National Socialist magazine (Tr. at 294; e.g., Govt. Ex. 9 at 1 & 3 and Ex. 35 at 1). Mazzola further admitted that the article entitled "'Kill This Nigger?' Goes To Print," exhibit 5, which was dated October 3, 2008, was not on Overthrow.com when Hoffman's information was posted on September 11, 2008. (Tr. at 288-89.)

18

Mazzola had the assistance of the FTK program installed by Messing; someone visiting the website would not have such a tool.  (Tr. at 326.)  Nowhere on the Overthrow.com website or blog did Mazzola see any statement suggesting that Hoffman be harmed.  (Tr. at 317.)  Nor did the National Socialist magazine article suggest that Hoffman be harmed.  (Tr. at 318.)

The government next called two former members of the ANSWP.  Philip Anderson, a twenty-two year old resident of Peoria Heights, Illinois, testified that he left the ANSWP after defendant's arrest, about two years before trial.  (Tr. at 327.)  He stated that he presently worked at McDonald's and lived with his parents.  (Tr. at 328.)

Anderson testified that he was eighteen when he joined defendant's organization, which he discovered through the internet, specifically the website Overthrow.com.  (Tr. at 328.)  In June 2007, he obtained an application for membership either from the website or the back of the ANSWP magazine, filled it out, and sent it in.  (Tr. at 329, 337; Govt. Ex. 55.)  A few weeks later, defendant called him and left a voice mail stating that he wanted to talk to Anderson about activism and joining.  (Tr. at 330-31.)  Anderson attempted to return the call but didn't get through.  He then received an e-mail from defendant or one of the other members advising him of a conference call.  (Tr. at 332.)  Anderson phoned in to join the conference call, which included other members, Mike Downs from Virginia, Mike Burks from Kentucky, and a woman from Texas.  (Tr. at 333-34.)

Shortly thereafter, in the summer of 2007, defendant appointed the eighteen-year-old Anderson Illinois State leader.  (Tr. at 332, 337.)  Anderson testified that his responsibilities as state leader included distributing fliers and recruiting others.  (Tr. at 339.)  However, Anderson said that he was able to enroll just one other ANSWP member in the State of Illinois, a high school friend who also lived in Peoria Heights and with whom Anderson listened to white

19

supremacist music.  (Tr. at 333.)

Anderson testified that he personally met with defendant twice, the first time at the ANSWP Congress in Kentucky in the summer of 2007, and the second at a Hitler celebration in Chicago in April 2008.  (Tr. at 334-35.)  He also participated in regular, bi-weekly conference calls conducted by defendant.  (Tr. at 336-37, 370.)  During these calls, defendant discussed the status of the organization, finances and how the magazine was doing, and each unit leader would then provide a report on the activities in his area.  (Tr. at 337, 370-71.)  Defendant would also ask the participants to do certain things.  However, at no time during such calls did defendant advocate violence.  (Tr. at 340, 371.)  Anderson testified that defendant never asked him to raise money or sell magazines; he did ask Anderson to recruit others, but, as noted, Anderson was able to recruit just one other person, his high school friend.  (Tr. at 340.) Anderson testified that he also attended rallies including one at St. Xavier College at which Elie Wiesel spoke.  (Tr. at 340.)

Anderson testified that he saw the Hoffman post on Overthrow.com in September 2008. (Tr. at 341.)  He also saw the "Hale's Jew-ror" magazine article.  (Tr. at 343.)  Anderson testified that shortly after these posts appeared, defendant called him and explained that the FBI had searched his home and that he believed it may have something to do with the posts about the Hale juror.  (Tr. at 343-44.)  Defendant asked Anderson if he had heard anything about anyone wanting to do something or if someone had already done something to the Hale juror.  Anderson said he hadn't.  Defendant asked Anderson to call around to others involved in the white supremacist movement, including Tom McLaughlin, Steve Johnson, and Art Jones, to find out if they had heard anything.  (Tr. at 344, 347.)  Anderson testified that defendant sounded shaken up and worried that someone would do something to the juror.  (Tr. at 344-46.)

20

Anderson called Johnson, who indicated that he had not seen the post about Hoffman. (Tr. at 347, 366.) Anderson testified that he made these calls because defendant asked him to and because he was concerned about harm being done to the juror. (Tr. at 353.) Anderson reported back to defendant during a conference call a few days later. During that call, defendant described to the other participants what he had earlier told Anderson – the FBI raided his house regarding the Hale juror. (Tr. at 354.) Defendant said "someone may be trying to do something." (Tr. at 354.) Anderson told defendant he had gotten ahold of Art and Steve and neither of them knew anything about it, but they would listen to see if they heard anything. (Tr. at 355.) Defendant said "okay." (Tr. at 356.) Defendant did not at that time sound anxious and concerned, as he had in the previous one-on-one call with Anderson. (Tr. at 356.) Shortly thereafter, Anderson learned that defendant had been arrested. (Tr. at 356.)

On October 29, 2008, about ten days after defendant's arrest, Anderson received a letter from defendant. (Tr. at 357; Govt. Ex. 53.) The letter stated:

> Phil, as you know, I've been arrested, and you are a very important witness in my case. I am writing to you to remind you to please stay in touch with my wife and my attorneys and let us know if your address changes or anything happens to you during the course of this trial. You will be asked to testify to the following:
> . . .
> (1) to my phone call to you on or about Sunday, October 12th, in which I discussed the FBI search warrant with you and asked you to contact Art Jones, Steve Johnson, and John McLaughlin to discover what happened to this juror and to stop anyone, particularly the Creators, who may have any plans against him.
> . . .
> (2) to our phone conference on or about Wednesday, October 15, in which I repeat the same instructions and at which Dan Jones, Rudy Orr, Mike Burks, yourself and I were in attendance. . . .
> (3) you may be asked about other aspects of ANSWP activism and your reading of the overthrow.com website. The key there will be to focus on the fact that you have never done anything criminal, and do not interpret articles on overthrow.com as criminal instructions. . . .
> (4) you should answer all questions truthfully, honestly, and with the fullness of the answer required. Do not guess or theorize.

(Tr. at 358-61, 369.) Asked how he interpreted this letter, Anderson answered: "I figured that's just what he's asking me to testify about." (Tr. at 361.) Anderson testified that he turned the letter over to the FBI, heard nothing further from defendant, and had not spoken to defendant since. (Tr. at 361.)

Anderson testified that between September 11, 2008, when the Hoffman post first appeared, and October 12, 2008, the date of the FBI search of defendant's house, defendant did not contact him about the matter. (Tr. at 364-65.) During the October 12 conversation, defendant asked Anderson to contact the Creators to find out if anything was going on; but defendant did not say that he had told them to do anything to Hoffman. (Tr. at 366.)

Anderson testified that defendant never asked him to harm anyone or do anything criminal. (Tr. at 368.) Anderson stated that he had conversations with defendant prior to the Chicago conference where Elie Wiesel spoke, which defendant did not attend, and defendant did not tell Anderson to hurt Wiesel in any way. (Tr. at 369-70.) And defendant did not tell him to harm anyone else as part of his ANSWP duties, including Mark Hoffman. (Tr. at 371.)

Anderson testified that in order to become a member of ANSWP an applicant had to have "good morals," which the application defined as:

> not having a spouse or custody of children of non-white racial heritage within five years of the date of application;
>
> Not having had sexual relations with a person of non-white racial heritage within five years of the date of the application;
>
> Having not been convicted, incarcerated, or under probation or parole for any infamous crime within five years of the date of application;
>
> Having not been treated for a mental illness with delusionary, hallucinatory, paranoid, or severe abnormal personality characteristics within five years of the date of application;

Having not been treated for substance or alcohol abuse within five years of the date of application;

Having not had an abortion within five years of the date of application;

Being heterosexual and without any public display of sexual fetish or deviance;

Providing maintenance for one's children;

Being gainfully employed insofar as one is capable of being so, though this shall not exclude the right of those disabled by injury or disease to join the party;

Not being employed in an infamous profession;

And not being active in any organizations whose goals run contrary to those of the party.

(Tr. at 376-77.) The ANSWP also performed a criminal background check on applicants, with a portion of the $50 membership fee going to the cost of the check. (Tr. at 377.) Generally, if something showed up on the check, the person was denied membership. (Tr. at 378.)

Regarding the Hoffman post, Anderson said he first saw it on the internet on September 11, 2008; there was no prior discussion among the members about putting this information up. (Tr. at 378-79.) The post did not say to harm Hoffman, and Anderson never saw anything on the website which said to harm Hoffman. (Tr. at 379.) Regarding other articles on the site, Anderson testified that one had to click on a link to see them. If one clicked on a link on September 11, 2008, the Hoffman information would go away, and the linked article would appear. Regarding the "Kill This Nigger?" magazine cover, which appeared next to the Hoffman post, Anderson testified that he had no knowledge that any ANSWP member intended to kill Barack Obama. (Tr. at 380.) Anderson testified that this was a catchy headline, and Overthrow.com was filled with catchy headlines. (Tr. at 380-81.)

The other ex-ANSWP member, Michael Burks, testified that he was twenty-nine, lived

in Louisville, Kentucky, and worked as a security guard. (Tr, at 381.) Burks testified that at age nineteen he joined his first white supremacist group, participating in several before joining the ANSWP, headed by defendant, in January 2007. (Tr. at 382-83.) Burks said he was aware of defendant before then, having read defendant's website, Overthrow.com, since 2005 or 2006. (Tr. at 383.) Burks testified that defendant was a member of the National Socialist Movement ("NSM") before splitting off to form the ANSWP. (Tr. at 384.)[8]

Burks testified that when he decided to join he first e-mailed the Kentucky leader, Michael Garrett, then e-mailed defendant. (Tr. at 384-85.) Defendant responded, asked Garrett to speak with Burks, and Burks joined after meeting with Garrett. (Tr. at 385.) In order to join, an applicant could download an application from the website, answer the questions, and send in $50; defendant would then do a background check. (Tr. at 385.) Burks testified that after going through this process he became a member, and within two months became the Kentucky state leader, as he had more experience in the white power movement than Garrett. (Tr. at 385-86.) Defendant later nominated Burks the Midwest regional director, which included Kentucky, Indiana, Iowa, Ohio, and Michigan, perhaps Missouri. At most, Burks had twenty to twenty-five people under him in that position, and in some of the states in his region they had no members. (Tr. at 386.) In September 2008, the group's contact list contained 300-400 names but only twenty to thirty paid members under him. Burks was unable to say how many people total were in ANSWP, as he never saw the membership lists for the other regions. (Tr. at 387.) Burks testified that at the time of trial he was not a member of any white supremacist organization, and that his beliefs had changed within the previous year and half. (Tr. at 388.)

---

[8]Burks testified that defendant operated Overthrow.com before the ANSWP was created in late 2006. (Tr. at 440-42.)

Burks testified that after he joined the ANSWP he spoke to defendant on a weekly basis by phone. Later, the group held bi-weekly conference calls, where members would call in; these calls would include as few as three or four, sometimes as many as ten to twelve people. (Tr. at 388.) The calls were conducted through Skype, and members would call a number in Oklahoma or Nebraska to be connected. (Tr. at 389.) During the calls, defendant would start by talking about fund raising and things going on at the national level, then the regional leaders would talk about things going on in their areas. (Tr. at 390.) As a regional leader, Burks could speak to the press or field questions from state leaders. He would go to defendant with membership problems. (Tr. at 390.) Ultimately, defendant would decide what to do about the problem member. (Tr. at 391.)

Burks testified that he saw the Hoffman posts on Overthrow.com on or around September 11, 2008. (Tr. at 391-92.) Later that month, during an ANSWP conference call, which also included Phil Anderson, Dan Jones, and Michael Downs, defendant stated that he had been advised by one of his lawyers that nobody contact Hoffman. (Tr. at 393-94.) Burks testified that in October 2008, he learned from a neo-Nazi website called Vanguard News Network that defendant had been arrested. (Tr. at 394.) Sometime thereafter, defendant's wife called Burks (Tr. at 395) and in late October or early November 2008 he received a letter from defendant. (Tr. at 396; Govt. Ex. 52.) The letter began: "I want to thank you for your support and your willingness to testify in the face of the Government's efforts against us. Your loyalty is not forgotten." (Tr. at 398.) Despite this introduction, Burks stated that he had not agreed to testify or do anything on defendant's behalf with respect to his arrest. (Tr. at 398.) Regarding the letter's use of the plural, i.e., "the Government's efforts against us," Burks testified that he understood this to refer to the entire ANSWP, or what defendant would refer

to as white working class people in general.  (Tr. at 398.)  Burks said that this was not the only

time defendant referred to himself in the plural; sometimes on Overthrow.com the article would

be attributed to "staff," but defendant told Burks that only he wrote articles for the site.  (Tr. at

399.)

> The letter continued:

> I do not know what my wife has told you about the case, but the key elements to
> which we need you to testify are as follows:

> (1) To the October 15th, 2008, phone conference, attended by Phil Anderson,
> Randy Orr, Dan Jones, yourself, and myself . . .  you were at a baseball game
> during the call, I do not know how much you followed, where I asked Phil how his
> efforts in Chicago to determine what had occurred . . . to Mr. Hoffman and to stop
> any efforts to harm him were going, and Phil responded he was working on it.

(Tr. at 399-400.)  Burks testified that he did not participate in this conference call.  He stated

that on October 15, 2008, he was at a minor league baseball game with his dad, and while he

was there Michael Downs called him and asked why he was not on the conference call; he

replied that he was at a baseball game, and the conversation lasted less than thirty seconds.

(Tr. at 400.)   Accordingly, Burks did not hear defendant ask about Anderson's efforts in

Chicago.  (Tr. at 401.)

> The next paragraph of the letter stated:

> if Justin Boyer is to be called as a witness against me, to our difficulties with him,
> . . . your desire for me to remove him, my statements to you in response, and .
> . . to his e-mails to you regarding the events in Lima, Ohio.

(Tr. at 401.)  Burks testified that Justin Boyer was the state ANSWP leader in Ohio.  (Tr. at

401.)  Burks said that in 2007 and 2008 he had conversations with defendant about Boyer, in

which he (Burks) told defendant that he wanted Boyer removed as state leader and kicked out

of the organization.  (Tr. at 402.)  Burks testified that he wanted Boyer kicked out because he

failed to show up for events and allegedly abused the mother of his children. (Tr. at 402-03.) Burks also advised defendant that Boyer was stupid, would disappear for weeks or months at a time, and that his phone was often disconnected. He told defendant more than once that he thought Boyer was unstable. Defendant normally responded that they had nobody else suitable for a leadership role in Ohio and "just go with the flow." (Tr. at 404.) Ultimately, defendant told Burks he was going to leave Boyer in place. (Tr. at 405.)

The third paragraph of the letter indicates that Burks was to testify:

> To the general activities of the ANSWP and to your reading of overthrow.com, particularly to our rejection of criminal activity and violent crime and as to how our profiles of various personalities in the news are intended to inform and educate and not to incite violent criminal activity.

(Tr. at 405.) Asked what he understood defendant to be asking here, Burks replied: "To make it seem that everything that ANSWP was was legal, that there was no illegal activities or anything illegal in some of the writings off overthrow.com." (Tr. at 405.) Burks said that he had a different understanding of Overthrow.com. (Tr. at 405.) When asked to elaborate, Burks testified:

> He did a few – he also did a radio show. He wrote an article once called, Kill Richard Warman, and also on the radio show he gave out the address of Richard Warman. He said this bastard has lived way too long. If somebody wants to kill him, here's his address. And he repeated that two or three times.

(Tr. at 406.) Burks said that although the third paragraph of the letter asked him to testify that nothing on the website was intended to incite violent criminal activity, he had a different understanding:

> Q     And what was that?
>
> A     He really didn't care if something did happen. It would be kind of like with the, I know I'm going to say his name wrong, but Ollie Wiesel.

Q      Elie Wiesel?

A      Yes.  For instance, he was attacked and Bill bragged that the person that attacked him was a loyal soldier and follower of his.

Q      So is it fair to say that on certain occasions, you actually understood the defendant's words and, both spoken words and written words, on overthrow.com to actually be requests that people go out and go violent things?
. . .
THE WITNESS:      Yes

Q      And so that is true with Richard Warman?

A      That's correct.

Q      And it's true with Elie Wiesel?

A      Correct.

Q      And do you remember any other instances where you understood it to be an actual request for people to do violence?

A      The Jena Six case.

Q      Could you explain very briefly what your understanding of the Jena Six case is?

A      He did a radio show on that topic, too, and he said they should be brought to town square and hung and sacrificed to the pagan god Odin.

Q      And did it provide addresses for the people that the defendant referred to as the Jena Six?

A      Yes, he did.

(Tr. at 407-08.)

The fourth paragraph of defendant's letter to Burks stated that "in all matters you should tell the truth and fully answer questions without evasion.  However, you should not guess or theorize or testify beyond your certain knowledge."  (Tr. at 408.)  Burks said that he could not follow the first three paragraphs and paragraph number four, because the first three paragraphs

28

contained lies, such as him being on the conference call when he was at a baseball game, and that there was no criminal activity on Overthrow.com or defendant's radio show. (Tr. at 408-09.)

The next paragraph of the letter stated that defendant had been in discussions with Willis Carto and Eric Gliebe "regarding a merger of the ANSWP and the National Alliance. I think such talks should continue. Now is the time for making friends, building bridges, and seeking alliances. We should seek refuge from the storm." (Tr. at 409.) Burks testified that Willis Carto had been involved in the white power movement for many years, was in his 70s or 80s, and ran a publishing company that promoted books and other white power material. (Tr. at 409.) Burks testified that defendant normally spoke in favor of Carto, but found him a "little too old-fashioned." (Tr. at 415-16.) Defendant normally viewed Gliebe "more negatively that he did Carto." (Tr. at 416.) Defendant thought that Gliebe (and the chairman of the National Alliance before him) had caused the downfall of the Alliance. (Tr. at 416.)

Burks further testified, based on conversations with defendant or reading defendant's statements, that defendant referenced "the Order," a white supremacist organization from the early 80s, which committed numerous crimes in the Northwest. (Tr. at 417.) Defendant "referred to what they did as justice to an extent; but, you know, he didn't totally agree with how they handled certain things." (Tr. at 417.) Defendant was aware of two particular members of the Order, David Lane and Bruce Matthews. Lane died in prison while serving a murder sentence, and the white power movement viewed him as a hero and a martyr to the cause; Matthews was killed in a gunfight with federal agents. (Tr. at 418-19, 422.) Defendant's views of Matthews "were normally positive." (Tr. at 419.) Defendant referred to Eric Hunt – the man who attacked Elie Wiesel – "as a loyal soldier." (Tr. at 419.) Asked if defendant considered

others to be martyrs to the cause, Burks said that defendant spoke highly of Hale and Laskey. (Tr. at 423.) However, Burks also testified that Carto, Gliebe, Lane, and Matthews were not members of the ANSWP, and that defendant's articles about Elie Wiesel were written after Eric Hunt attacked Wiesel. (Tr. at 426.)

Defendant's letter concluded that Burks was to work with Dan Jones and Chris Drake, the south regional leader. However,

> Chris is taking a hiatus because of his daughter's birth. The future of the ANSWP is with you there. And remember that I have only been gone 13 days and may be released as early as November 12th. I will not be continuing overthrow.com and will be able to do little activity with the charge pending, but that does not mean that the world falls apart in my absence.
> . . .
> [T]rust both my wife and Robert Campbell. Robert in particular will speak for me in my absence. Help build the legal defense fund and stay in touch with my wife so that we can bring you in to testify.
> . . .
> [R]emember that they cannot hold me forever and that these nuisance arrests are part of the business of sticking your thumb in the eyes of the powerful. Injury is part of struggle and struggle is necessary for victory.
> . . .
> PS . . . keep me informed of the November 13th grand jury.
> . . .
> PPS . . . if I am moved to Chicago, correspond with me through my wife.

(Tr. at 420-21.) Burks testified that by the time he received this letter, he had been subpoenaed to testify before the Roanoke grand jury. (Tr. at 421.)

Burks testified that the FBI approached him in 2007 about a mail fraud matter involving Dan Jones, and that he was "a little afraid" they would also come after him. (Tr. at 428.) The FBI also approached him regarding this case, and he turned over the letter defendant wrote him without hesitation. (Tr. at 428-30.) He also admitted that the letter defendant sent him said to tell the truth "in all matters." (Tr. at 431.) The letter did not tell Burks to contact other people, either about a merger or to make sure nothing happened to Hoffman. (Tr. at 432.) Regarding

30

Boyer, Burks said that Boyer told him he had been arrested for abuse, but Burks did not obtain any reports or otherwise verify that Boyer had in fact been arrested.  (Tr. at 433.)  As soon as the ANSWP determined that there was a warrant for Boyer's arrest, Boyer was put on a leave of absence (Tr. at 433), and he later quit on his own (Tr. at 434).

Burks testified that an applicant for membership in the ANSWP could not have a criminal background.  Small, distant crimes might be overlooked, but major offenses would result in rejection.  (Tr. at 438-39.)  The three goals of the ANSWP were to (1) gain a healthy following, (2) obtain political position to gain power, and (3) divide the U.S. by race and deport non-whites back to their country of origin.  (Tr. at 439-40.)  There was no goal to harm people or commit violence.  (Tr. at 440, 442.)  Defendant never told Burks to harm anyone.  (Tr. at 443-44.)  Nor did Burks ever do anything illegal for defendant.  (Tr. at 444.)  During the conference calls between September 11, 2008, and October 12, 2008, defendant did not mention Hoffman other than the one statement about what his lawyer told him to do.  (Tr. at 445.)  No one posted anything on Overthrow.com saying they were going to do anything to Hoffman.  Nor, during his time as a member of the ANSWP, did Burks learn that anybody was going to hurt Hoffman.  (Tr. at 445-46.)

On re-direct, Burks confirmed that the ANSWP's stated goals did not include violence.

Q      Nonetheless, what was your understanding of the posting such as, Kill Richard Warman?
. . .
THE WITNESS:      I don't know any other definition of the word "kill."  When somebody says kill this bastard, I don't know what else that can possibly mean. When he gives out his address and says somebody should kill this bastard.  I don't know how else you can interpret that to mean.
. . .
Q      How else other than what?

A      To actually kill him.  I mean, there's only one, like I said – word "kill" means

to end somebody's life.

Q       What about lynch the Jena Six?

A       Same concept.  Like I said, when he did the radio show, he said they should be brought to the town square and sacrificed to the god Odin.

(Tr. at 448.)

The government then rested.  (Tr. at 451.)  Subject to making a Rule 29 motion, defendant rested without presenting evidence and then argued the motion outside the presence of the jury.  (Tr. at 451-52, 456.)  I reserved decision and submitted the case to the jury.  (Tr. at 455.)

The jury deliberated from 4:17 p.m. to 6:04 p.m. on January 4, then went home for the evening.  (Tr. at 559.)  It recommended deliberation at 9:00 a.m. on January 5 and at about 11:25 a.m. sent me a note stating:

Requests from the jury.  And then the first thing is the courtroom be cleared of visitors/press.

Second thing is the jurors be taken out through a different exit building.

Third, jurors have reached a verdict.

(Tr. at 563.)  After soliciting the views of counsel, I advised the jury that they would be escorted out through a different exit, but that I had no authority to clear the courtroom of visitors and press.  I also advised that there were no photographers or sketch artists in the courtroom.  (Tr. at 565-66.)[9]  The jury then returned a verdict of guilty.  (Tr. at 567.)

_____

[9]During the trial, one of the jurors also expressed concerns that his identity would be revealed.  Specifically, Juror 8 alerted the court security officer ("CSO") to his concern about placing his name on the juror sign-in sheet used to track attendance and pay the jurors.  (Tr. at 259-62.)  On the agreement of the parties, I questioned Juror 8 in chambers (Tr. at 263), advising him that the sign-in form was internal and not available to the public, and asked if he was comfortable knowing that.  He replied: "No, I'm not comfortable, no.  I'm concerned about

## II. RULE 29 STANDARD

Rule 29 provides that the court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In considering a challenge to the sufficiency of the evidence, the court determines whether, viewing the evidence in the light most favorable to the government and bearing in mind that it is the exclusive function of the jury to determine the credibility of the witnesses, resolve evidentiary conflicts, and draw reasonable inferences, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See, e.g., United States v. Lewis, Nos. 09-3954, 09-3961, 10-1204, 2011 WL 1261146, at *5 (7th Cir. Apr. 6, 2011); United States v. Allen, 383 F.3d 644, 646 (7th Cir. 2004); United States v. Payne, 102 F.3d 289, 295 (7th Cir. 1996); United States v. Reed, 875 F.2d 107, 111 (7th Cir. 1989).

If the court reserved ruling on a motion made during trial, it decides the motion based on the evidence at the time ruling was reserved. Charles A. Wright, Federal Practice and Procedure § 462, at 282 (2000). Here, defendant moved for acquittal at the close of the government's case, at the close of all evidence, and again after the verdict. I reserved decision

---

the names being distributed on the form and it was displayed on the table and --" (Tr. at 264.) I told the Juror that the "form is not available to the public. And if there's any concerns that you have about that, I think I have the authority to seal it so that it could be – so that no one could ever ask for it and obtain it." (Tr. at 264.) Juror 8 replied: "I would appreciate that." (Tr. at 264.) On questioning from the government, Juror 8 indicated that he did not discuss the issue with any other juror, and that no one else was present when he raised it with the CSO. (Tr. at 264-65, 266.) Defense counsel asked what Juror 8 was concerned about, and he replied: "My concerns are about my name being associated with this trial." (Tr. at 265.) Counsel asked: "Based on fear or something else?" Juror 8 replied: "Based on what the trial is about." (Tr. at 265.) I asked Juror 8, given the fact that I would seal the list of juror names, whether he was "in a position to render a fair verdict to both – to consider the evidence and to decide the case solely on the evidence and the law as I instruct you?" He replied: "Yes." (Tr. at 266.) Defendant moved that Juror 8 be removed and replaced with an alternate; I reserved decision at the time (Tr. at 267) and later denied the request (Tr. at 545).

on defendant's motion during the trial.  However, because the defense presented no evidence the evidence relevant to all of the motions is the same.

## III.  DISCUSSION

In order to obtain a conviction in this case, the government had to prove two things. First, the government had to show that defendant solicited, commanded, induced or otherwise endeavored to persuade another person to commit a violent federal crime against Mark Hoffman.  As I instructed the jury and as the parties agreed, whether a particular statement is a solicitation is determined by an objective standard.  That is, a statement is a solicitation if a reasonable person hearing or reading it and familiar with its context would understand it as a serious expression that another person commit a violent felony.  Second, the government had to prove, with strongly corroborative evidence, that defendant intended that another person commit a violent federal crime against Hoffman.  (Tr. at 551-54.)

After a careful review of all the evidence, I find that the government failed to present sufficient evidence from which a reasonable jury could find either element.[10]  I further find that defendant's statements about Hoffman were protected by the First Amendment.  Accordingly, and as the Seventh Circuit acknowledged I could do if the evidence warranted it, White, 610 F.3d at 962, I will grant defendant's motion for a judgment of acquittal.

## A.    Whether There Was a Solicitation

The words defendant used in his three posts about Mark Hoffman did not expressly

---

[10]In their post-verdict briefs, the parties focus on the second (intent) element.  However, as the parties agreed, the government had to first prove that the Hoffman posts, viewed objectively and in context, constituted a solicitation.  It cannot be the case, as the government seems to suggest, that proof of defendant's intent is sufficient to prove both elements of the offense.  If this were so, what defendant actually said would be entirely irrelevant.

solicit anyone to harm Hoffman. Indeed, they did not suggest or imply that anyone do anything to Hoffman. In its decision in this case, the Seventh Circuit noted that a solicitation can be coded or implicit and remanded for consideration of the context of the posts based on a complete presentation of the evidence. Having now heard all the evidence, I am convinced that no reasonable factfinder considering the posts and the context in which they were made could conclude, based on an objective standard, that they constitute a solicitation. If anything, the evidence presented at trial weakened the government's case, as it is now clear that (1) the context of the posts was that they were part of an article that defendant wrote on the occasion of Matthew Hale's post-conviction motion relating to Hoffman's selection as a juror, as discussed in the local media five years after Hale's conviction; (2) the posts were based entirely on publicly available information, much of it drawn from Hoffman's own bio on the Northwestern University website; and (3) there is no evidence that the posts could reasonably be regarded as a coded solicitation to harm Hoffman or that any member of defendant's organization or target audience read them as a coded solicitation or that defendant had any followers who were ready and willing to commit violence based on his writings.

Some of the other posts the government introduced did contain violent imagery, but most did not appear contemporaneously with the Hoffman posts. Further, many of them, read in their entirety and in context, consist of little more than inflammatory statements of opinion. And the few that cross the line show only that defendant knew how to call for violence when he wanted to; such posts cannot reasonably transform the Hoffman posts which do not solicit violence into a violation of § 373.

### 1. The Context of the Initial Post

On September 11, 2008, the <u>Chicago Sun-Times</u> printed an article discussing Hale's

post-conviction motion, in which Hale challenged Hoffman's selection as a juror. In particular, Hale criticized his lawyer for allowing Hoffman – a gay man with an African-American partner employed by Northwestern University, where one of Ben Smith's shooting victims had also worked – to serve on the jury. The evidence showed that defendant created the posts containing the alleged solicitations in response to that article. In the initial post, defendant discussed the particulars of Hale's motion, including Hale's lawyer's failure to challenge Hoffman, a government search warrant, and an inaccurate transcript. The post also mentioned the belief "among white organizations" that Hale's lawyer threw the case.

## 2. The Contents of the Post

The post also contained a photo of Hoffman drawn from the Northwestern website, along with the caption the government contends constituted a solicitation. Again, that caption reads:

> Gay Jewish anti-racist Mark P Hoffmann was a juror who played a key role in convicting Hale. Born August 24, 1964, he lives at 6915 HAMILTON #A CHICAGO, IL 60645 with his gay black lover and his cat "homeboy". His phone number is (773)274-1215, cell phone is (773)426-5676 and his office is (847) 491-3783.

As indicated above, neither this post, nor the two virtually identical posts that followed (one on the blog portion of the site, the other appearing the next day after Northwestern blocked Hoffman's photo), contained any express threat or solicitation. Further, the evidence at trial revealed that all of the information in the post was in the public domain; indeed, much of it came from the Northwestern website containing the photo.[11] At the Hale trial, Hoffman revealed his sexual orientation and the race of his life partner, issues Hale also raised in his post-conviction

_____

[11]Hoffman testified that he is not Jewish. Ostensibly, defendant assumed that he was because of his sur-name.

motion.  Hoffman testified that he listed his cat's name on his on-line Northwestern bio,[12] along with his office and cell phone numbers.  His (former) home address and phone number could be found in any number of locations, from the white pages to county records.

### 3. Defendant's Followers and "Target Audience"

In remanding the case, the court of appeals indicated that the government advised at oral argument that it had further evidence of the website's readership, audience, and the relationship between defendant and his followers, which would show that the posting was a specific request to defendant's followers, who understood that request and were capable and willing to act on it.  White, 610 F.3d at 962.  No such evidence was presented.

The government presented testimony from two former members of defendant's group, Anderson and Burks, neither of whom testified that they read the Hoffman posts as a solicitation.[13]  The government presented no testimony from anyone in defendant's "target audience" that they read the Hoffman posts as a solicitation.[14]  Nor did the government present

_____

[12]Perhaps the most troubling component of the Hoffman posts, as they appeared in the indictment, was the reference to Hoffman's cat.  What legitimate purpose would printing Hoffman's pet's name serve?  What sort of investigation into Hoffman's private life did defendant perform to learn his cat's name?  We now know that defendant simply pulled this name, like much of the other information, off the Northwestern website.

[13]Anderson testified that the post did not say to harm Hoffman, and he never saw anything on the website that said to harm Hoffman.  (Tr. at 379.)  Burks testified that he did read certain other posts – about Richard Warman, the Jena Six, and Elie Wiesel – as solicitations to violence, but he did not testify that he read the Hoffman posts the same way.

[14]Two readers of the Overthrow.com blog commented on the Hoffman post.  One stated that this was why he advocated that racists register to vote, presumably so they could serve on juries.  The other asked for bets on how quickly Hoffman would turn off his phone.  Apparently, neither considered the post as a solicitation of violence: the first took it as a call for racists to get themselves on juries, and the second assumed that Hoffman would receive phone harassment based on the post (which, as it turned out, is exactly what happened).

any evidence that any member of defendant's audience was prepared to act on the Hoffman posts. To the contrary, the evidence showed that when Anderson contacted other members of the white supremacist community in the Chicago area, none had even seen the Hoffman post, much less made plans to act on it.

Nor did the evidence show that defendant commanded some dangerous group ready to act on his wishes. Hoffman lived in Chicago, and the evidence showed that the Illinois chapter of the ANSWP, headed by the teen-aged Anderson, had two members: Anderson and the high school friend with whom he listened to racist music. The entire Midwest region, under the command of Burks, had twenty to twenty-five members. When the group would hold nation-wide conference calls, just a handful of people typically participated. Further, Burks and Anderson testified that defendant never directed that anyone be harmed. It is true that Burks testified about illegal activities associated with the ANSWP, but when pressed for specifics he mentioned only defendant's inflammatory statements about Warman, Wiesel, and the Jena Six. When asked directly, Burks testified that the ANSWP's goals did not include violence, and he was never asked to engage in violence for defendant.

The government presented evidence that defendant was aware of and at times spoke favorably of others who engaged in violence, including Hunt, Laskey, and "Order" members Matthews and Lane. But none of these people were members of the ANSWP, and the government presented no evidence that they read Overthrow.com: Laskey was in prison, and Matthews and Lane were dead (as was Ben Smith). Defendant praised Hunt – and tried to take credit for inspiring him – but the evidence showed that defendant's articles about Elie Wiesel came <u>after</u> Hunt attacked Wiesel; the government presented no evidence of any post soliciting

an attack on Wiesel <u>before</u> Hunt did so.[15]  The government also presented evidence that defendant initially resisted efforts to remove the allegedly "unstable" Boyer from the Ohio leadership post, but the record contains no evidence that Boyer ever saw the Hoffman posts or did anything illegal on behalf of the ANSWP.  To the contrary, Burks's testimony cast Boyer as an unreliable screw-up, not a soldier willing to act on defendant's words.

This leaves the possibility that some unidentified "loan wolf" might read the posts as a solicitation and act on them.  But such speculation cannot take the place of proof beyond a reasonable doubt.  <u>See</u> <u>United States v. Perez-Melendez</u>, 599 F.3d 31, 45 (1st Cir. 2010).

The government makes much of defendant's post-arrest request that Anderson reach out to the Creators to make sure nobody harms Hoffman.  The government argues that there would be no need to ask them to stand down if he had not first asked them to stand up.  But as the government agreed at trial, whether a statement is a solicitation is judged by an objective standard; further, as the Seventh Circuit stated in its opinion in this case, the crime of solicitation is complete once the words are spoken with the requisite intent, and no further actions from either the solicitor or the solicitee are necessary.  <u>White</u>, 610 F.3d at 960.  Thus, what defendant did afterwards is irrelevant to the first element of this offense.[16]

### 4.    The Other Posts

With no evidence that the Hoffman posts themselves solicited violence against Hoffman,

---

[15]The government asked Burks about defendant's willingness to merge with Carto and Gliebe, but nothing in the record suggests that the elderly Carto read Overthrow.com or was willing to act on what he read.  Defendant and Gliebe apparently didn't get along, and defendant blamed Gliebe for the downfall of the National Alliance.  And the government presented no evidence that Gliebe engaged in acts of violence.

[16]Defendant's actions after he posted Hoffman's information might be relevant to his intent, an issue I discuss later in this decision.

or any evidence that the target audience read them as a solicitation, that leaves the other posts introduced by the government, some of which contained inflammatory statements and/or calls for violence. A careful look at these others posts shows that they cannot reasonably transform the Hoffman posts into a solicitation.[17] The fact that a person has previously listed an individual's name and address along with a call for violence cannot mean that any time he subsequently names a person on the same website such post is reasonably read as a solicitation of violence. Moreover, most of these posts were far removed from the Hoffman posts; only the Obama magazine cover and a link to the "Kill Richard Warman" article appeared at the same time as the Hoffman posts. Thus, a reader who did not have the benefit of the FBI's Forensic Tool Kit software would have to look around to find articles about, say, the Lefkow murders, the Jena Six, Elie Wiesel, or Leonard Pitts.

Turning first to the contemporaneous post: The "Kill This Nigger?" magazine, which appeared next to Hoffman's picture in exhibit 2, contains an inflammatory headline, but when one actually reads the article, it is clear that defendant was not advocating any harm to Barack Obama (much less to Hoffman). Rather, as indicated in the blog post (Govt. Ex. 1), defendant sought donations to print the magazine for distribution in "swing markets" prior to the presidential election. The article attacked Obama's "radical communist politics" and looked "into the phony 'Obama Assassination' conspiracies that have circulated in the Jewish press." Nowhere does it call for anyone to harm Obama. The magazine cover appears to depict crosshairs on Obama's head, but this type of imagery is not uncommon in our politics. See,

---

[17]It is important to note that I permitted the government to introduce these posts as evidence of defendant's intent. (R. 133 at 7-8.) Defendant was not in this case charged with soliciting violence against anyone other than Hoffman, and it would be improper to infer that defendant has a propensity to engage in threatening conduct based on these previous posts.

*e.g.*, David M. Herszenhorn, <u>After Attack, Focus in Washington on Civility and Security</u>, N.Y. Times, Jan. 10, 2011 (discussing former Republican vice-presidential candidate's web post placing crosshairs over targeted congressional districts and her call for supporters to "reload" rather than "retreat," and whether such posts contributed to the later shooting of one of the representatives so targeted); <u>see also</u> Brian Stelter, <u>Spotlight From Glenn Beck Brings Threats</u>, N.Y. Times, Jan. 22, 2011, at A14 (discussing comments on Glenn Beck's website threatening the life of Frances Fox Piven, whom Beck had called "an enemy of the Constitution"). In any event, defendant placed no crosshairs over Hoffman's photo.

Appearing beside the Hoffman post were links to various articles, including number 11 on the list – "Kill Richard Warman." (Govt. Ex. 2.) Within that article, posted on March 26, 2008, defendant states that Warman "should be drug out into the street and shot, after appropriate trial by a revolutionary tribunal of Canada's white activists," stating that it "won't be hard to do, he can be found, easily, at his home, at [address.]" (Govt. Ex. 11.) The article then proceeds to discuss defendant's feud with Warman, and the alleged double standard whereby calls for the death of Saddam Hussein or Osama bin Laden are permitted but calls for Warman's death are not. Defendant was not in this case charged with soliciting harm to Warman, so it is unnecessary to fully explore the context of this article. For purposes of the instant charge it suffices to note that nowhere in this article does defendant mention Hoffman or the Hale trial, or advocate that any other "enemies" be harmed, and the testimony showed that when a user clicked on the link to this article the Hoffman post disappeared from the page.

Nor did defendant mention Hoffman in any of the other posts introduced by the

government, which, as indicated above, are set forth in the appendix.[18]   The closest any of these prior posts came was a March 1, 2005 article about the Lefkow murders, wherein defendant stated (among other things) that "everyone associated with the Matt Hale trial has deserved assassination for a long time." (Govt. Ex. 14 at 1.)  This is far too remote to transform the September 2008 Hoffman posts into a solicitation.  Mazzola was able to find this post by using the FBI's FTK software, but an ordinary reader in September 2008 would have had to scroll through years of entries, comprising thousands of posts, to find this article.  The government presented no evidence that anyone connected these posts or otherwise read both of them.  Further, this post was created long before the ANSWP came into being, at a time when defendant held no leadership position in any white supremacist group.

For all of these reasons, the evidence was insufficient to establish that defendant's posts about Hoffman constituted a solicitation of a violent crime.

## B.    Whether the Government Presented Strong Corroboration of Intent

While the issue of defendant's intent is a slightly closer question than whether there was a solicitation, I conclude that no reasonable juror could find that the government proved that defendant intended the Hoffman posts as requests that someone harm Hoffman.  On the issue of intent, Burks probably said it best: "[Defendant] really didn't care if something did happen." (Tr. at 407; see also Govt. Ex. 31 at 2: "Frankly, if some loony took the info and killed [Pitts], I wouldn't shed a tear.")

The government presented no direct evidence that defendant intended harm to Hoffman. Rather, the government argues that the other Overthrow.com posts it introduced demonstrated

---

[18]Anderson specifically testified that he saw nothing on Overthrow.com threatening Hoffman.

defendant's desire that harm come to his perceived enemies. That defendant may have intended others, such as Richard Warman and the Jena Six, be harmed, only shows that defendant knew how to speak directly when he wanted to. The absence of any language calling for harm to Hoffman, contrasted to what he said in these others posts – "kill" Warman, "lynch" the Jena Six – cuts strongly against a finding of intent.

The government further argues that Burks and Anderson's testimony showed that defendant was aware of white supremacists willing and capable of performing acts of violence, and his intent to reach such people to harm his enemies. But defendant's mere awareness that violent individuals exist does not equate to specific intent that one of those individuals act on defendant's post. Knowledge, suspicion, or even hope that something might happen to Hoffman is not enough. The government had to show, through "strongly corroborative circumstances," that defendant intended for another person to harm Hoffman.

Further, as discussed above, the Burks/Anderson testimony on this point was sparse. The government presented no evidence that any member of defendant's organization or target audience was ready and willing to act on the Hoffman posts. The evidence instead showed that the other members of Chicago's white supremacist community Anderson contacted had not even seen the Hoffman post, much less made any plans to act on it. As also discussed above, the evidence showed that the ANSWP was hardly a fearsome, disciplined, or violent organization. And the specific, violent individuals Burks said defendant was aware of – Smith, Hunt, Laskey, Matthews, and Lane – were either dead or in prison, and so far as the record shows none of them ever read Overthrow.com at any time. Burks's testimony about former Ohio ANSWP leader Boyer also says little about defendant's intent, as Boyer was out of the group at the time of the Hoffman posts and so far as the record shows never saw them and

43

never committed any acts of violence on behalf of the ANSWP or against defendant's "enemies."

As indicated, the government had to present circumstances "strongly corroborative" of defendant's intent, and the jury was provided a list of relevant corroborating factors (Tr. at 552-53), a review of which shows that the government failed to meet its burden. First, the government presented no evidence that defendant offered or promised payment or some other benefit to anyone if he would commit the offense. Nor did the government present any evidence that defendant threatened harm or other detriment to anyone if he would not commit the offense.

Second, the government failed to show that defendant repeatedly solicited the commission of the offense, held forth at length in soliciting the commission of the offense, or made express protestations of seriousness in soliciting the commission of the offense. Defendant first displayed the Hoffman post on September 11, 2008 (on the main page and blog sections of Overthrow.com), and re-posted it on September 12, 2008, after Northwestern blocked Hoffman's photo. Thereafter, he said nothing further about Hoffman on the website. This hardly qualifies as a "repeated" solicitation. Nor did defendant at any time before he posted Hoffman's information discuss the matter with the ANSWP or its members (or anyone else so far as the record shows).

Defendant's communications with ANSWP members after the post included his statement during a conference call that no one was to contact Hoffman, and his request that Anderson find out if anyone was planning to harm Hoffman and, if so, to stop them. The government argues that there would be no need to prevent an attack unless one had first been provoked. But this is not strongly corroborative evidence that defendant, at the time he posted

Hoffman's information, intended someone commit a crime of violence against this juror. See White, 610 F.3d at 960 (noting that the crime is complete once the words are spoken with the requisite intent). Rather, it is evidence that in October 2008, after the posts had been created, defendant came to believe that, after years of similar posts, which provoked no searches or arrests, or actual attacks on the people defendant named, something different and unforeseen may be occurring here. His attempts to prevent any attacks or further contact with Hoffman more likely shows that he did not want anything to happen to Hoffman than the converse. It is also important to note that this was not a situation where defendant had secretly solicited a crime, came to believe that the law may be on to him, then tried to stop the attacker from acting. Here, the alleged solicitation appeared on the world wide web for all to see; any later attempt to "take it back" would be less than ineffectual and thus very weak corroboration of intent. It is also important to note that when defendant, shortly after the Lefkow murders, came into possession of personal identifying information about people involved in the Hale case, he declined to republish it because "at this time we feel there is so great a potential for action linked to such posting that we are not going to post email and its details at this time." (Govt. Ex. 16; Tr. at 237-38.)

Third, the government presented no evidence that defendant believed or was aware that the person he solicited had previously committed similar offenses. The government, through Burks, showed that defendant was aware that white supremacists like Smith, Hunt, Matthews, and Lane committed acts of violence, but it failed to show that any of those individuals read Overthrow.com or saw the Hoffman posts. As discussed above, the violent individuals the government discussed at trial were either dead or in prison at all relevant times. The possibility that "some loony" – as defendant stated in one of the Pitts posts – might act on defendant's

posts is simply insufficient to show the "strongly corroborative circumstances" the statute requires.

Fourth, the government presented no evidence that defendant acquired weapons or tools suited for use by the person solicited in the commission of the offense, or made other apparent preparations for the commission of the offense by the person solicited. And the re-posting of publicly available information about Hoffman cannot constitute the sort of "information" required to strongly corroborate defendant's intent that someone attack Hoffman on account of his jury service in the Hale case. The government argues that defendant "went to great lengths" to acquire Hoffman's information (R. 153 at 5), but the record does not support that claim; as discussed, most of the information came from Hoffman's bio on the Northwestern website, and all was publicly available.

For all of these reasons, the evidence was insufficient to show that defendant intended his posts to be a solicitation for someone to harm Hoffman.

## C.    The First Amendment

In my previous decision dismissing the indictment, I discussed in detail the First Amendment's protection of speech that allegedly incites violence. White, 638 F. Supp. 2d at 942-58. As I indicated there – and as I instructed the jury at trial – the First Amendment protects vehement, scathing, and offensive criticism of others, including individuals involved in the criminal justice system, such as Juror Hoffman. See id. at 945 (collecting cases). Speech is "protected unless both the intent of the speaker and the tendency of his words was to produce or incite an imminent lawless act, one likely to occur." Freeman, 761 F.2d at 552 (citing Brandenburg v. Ohio, 395 U.S. 444, 447-48 (1969)). Knowledge or belief that one's speech, even speech advocating law breaking, might cause others to act does not remove the

speech from the protection of the First Amendment, unless the speech is directed to inciting imminent lawless action and is likely to produce such action. See Brandenburg, 395 U.S. at 447; see also Ashcroft v. Free Speech Coalition, 535 U.S. 234, 245 (2002) ("The prospect of crime . . . by itself does not justify laws suppressing protected speech."). Nor may the government, consistent with the First Amendment, penalize speech approving of past violence by others. Planned Parenthood of Columbia/Willamette, Inc. v. American Coalition of Life Activists (hereafter PPCW), 290 F.3d 1058, 1091 n.3 (9th Cir. 2002) (Kozinski, J., dissenting) (citing Hess v. Indiana, 414 U.S. 105, 108-09 (1973); Brandenburg, 395 U.S. at 447; Edwards v. South Carolina, 372 U.S. 229, 237-38 (1963); Noto v. United States, 367 U.S. 290, 297-99 (1961)). And this highly protective standard applies to the type of speech at issue here – internet communications disclosing personal information about others – even when that speech may tend to alarm or intimidate the persons so identified or expose them to unwanted attention from others. See White, 638 F. Supp. 2d at 952-58 (citing United States v. Carmichael, 326 F. Supp. 2d 1267 (M.D. Ala. 2004); Sheehan v. Gregoire, 272 F. Supp. 2d 1135 (W.D. Wash. 2003); City of Kirkland v. Sheehan, No. 01-2-09513-7, 2001 WL 1751590 (Wash. Super. Ct. May 10, 2001)).

Applying these standards, it is clear that defendant's posts about Hoffman are protected by the First Amendment. Even reading them within the overall context of Overthrow.com, the Hoffman posts are not directed to inciting or producing imminent lawless action. Neither these posts – nor any of the other content on Overthrow.com – solicit, command, request, or even suggest that anyone do anything to Hoffman, presently or in the future. The fact that the posts may have singled Hoffman out for the attention of unrelated, potentially violent third parties does not remove them from the protection of the First Amendment. Sheehan, 272 F. Supp. 2d

at 1150 (citing <u>Planned Parenthood of Columbia/Willamette, Inc.</u>, 290 F.3d at 1063).   Like the

<u>Sheehan</u> court, I do not "intend to minimize the real fear of harm and intimidation" that those

involved in the court system may experience based on disclosure of personal information about

them.

> However, we live in a democratic society founded on fundamental constitutional
> principles.  In this society, we do not quash fear by increasing government power,
> proscribing those constitutional principles, and silencing those speakers of whom
> the majority disapproves.  Rather, as Justice Harlan eloquently explained, the
> First Amendment demands that we confront those speakers with superior ideas:
>
>> The constitutional right of free expression is powerful medicine in
>> a society as diverse and populous as ours.  It is designed and
>> intended to remove governmental restraints from the arena of
>> public discussion, putting the decision as to what views shall be
>> voiced largely into the hands of each of us, in the hope that use of
>> such freedom will ultimately produce a more capable citizenry and
>> more perfect polity and in the belief that no other approach would
>> comport with the premise of individual dignity and choice upon
>> which our political system rests.  To many, the immediate
>> consequence of this freedom may often appear to be only verbal
>> tumult, discord, and even offensive utterance.  These are, however,
>> within established limits, in truth necessary side effects of the
>> broader enduring values which the process of open debate permits
>> us to achieve.  That the air may at times seem filled with verbal
>> cacophony is, in this sense not a sign of weakness but of strength.
>> We cannot lose sight of the fact that, in what otherwise might seem
>> a trifling and annoying instance of individual distasteful abuse of a
>> privilege, these fundamental societal values are truly implicated.

<u>Id.</u> at 1150 (quoting <u>Cohen v. California</u>, 403 U.S. 15, 24-25 (1971)).

Quoting from a portion of the Seventh Circuit's decision in this case, the government

argues that the jury, by finding a solicitation, "removed any involvement of the First Amendment

in this case."  (R. 153 at 7.)  But the government ignores the fact that the Seventh Circuit also

stated that, after the government presented its case, the court may conclude a reasonable jury

could not find that defendant's intent was for harm to befall Hoffman, as opposed to mere

electronic or verbal harassment. <u>White</u>, 610 F.3d at 962. For the reasons stated, no reasonable jury could have found defendant's posts about Hoffman unprotected, and I conclude based on the entire trial record that as a matter of law they were covered by the First Amendment. Therefore, defendant's Rule 29 motion must be granted.

A final note: In remanding the case, the court of appeals stated that if defendant's intent was to make a political point about sexual orientation or to facilitate opportunities for other people to make such views known to the Juror, or to permit electronic or verbal harassment, he would not be guilty of solicitation because he did not have the requisite intent required for the crime. <u>White</u>, 610 F.3d at 961-62. While it is true that the crime of solicitation is complete at the time the words are spoken with the requisite intent, and no further action need follow, it is worth noting that "electronic and verbal harassment" is exactly what happened here. Hoffman received crude text massages and one harassing phone call. But no one threatened him, and no attempts were made to harm him.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion for acquittal is **GRANTED**.[19]

Dated at Milwaukee, Wisconsin, this 19th day of April, 2011.

/s Lynn Adelman

_____

LYNN ADELMAN
District Judge

---

[19]In his Rule 29 motion, defendant argues that his jury did not represent a reasonable fact-finder, as its verdict was based on fear rather than the evidence and the law.   He points to Juror 8's concerns about the sign-in sheet, and the jury's note requesting that the courtroom be cleared before the verdict was read and that they be escorted out through a different exit. However, defendant cites no authority supporting the notion that this sort of claim supports entry of a judgment of acquittal (as opposed to perhaps a new trial before a different jury, see United States v. O'Neal, 180 F.3d 115, 118 (4th Cir. 1999), an argument defendant does not make).  In any event, because I grant the motion based on the sufficiency of the evidence I need not further address this claim.

**APPENDIX – GOVERNMENT EXHIBITS 1-35**

Exhibits 1, 2, and 4 included the three Hoffman posts, as well as the additional text discussed in the court's decision. (Govt. Ex. 1, 2, and 4; Tr. at 204-07.)

Exhibit 5, a post dated October 3, 2008, which pertained to the Obama magazine, bore the headline, "'Kill This Nigger?' Goes to Print" and sub-headline, "20,000 Copies Of A 16-Page Magazine; Thank All Of You For Your Support." (Govt. Ex. 5 at 1; Tr. at 207.) The post continued:

> The already infamous "Kill This Nigger?" issue of National Socialist magazine went to print tonight, and will begin distribution the week of October 13th. A nominal 20,000 copies of the magazine, which will likely be 22,000 - 25,000 after overruns, will be distributed in 14 major drops and dozens of smaller lit drops across the country.
>
> While last minute donations did push our publishing budget over the top, money is still needed to help support the volunteers who will distribute the issue, and to publish our next, upcoming issue of the magazine on time.
>
> A preview of the "Obama assassination" issue follows:

(Govt. Ex. 5 at 1; Tr. at 208.) The post then previewed the articles in the magazine, including the "Hale's Jew-ror" piece discussed in the court's decision. (Tr. at 209-12.)

Exhibit 8, which appeared on the blog portion of the site in October 2007, contained various short articles (totaling 11 pages as printed), including references to defendant's posting of the addresses of the "Jena Six," the group of black teenagers who had been accused of beating a white teen in Jena, Louisiana. (Govt. Ex. 8; Tr. at 213-16.) One of the articles, entitled "Roanoke Times Angry It Is Not Illegal To Post The Jena Six Addresses," contained a link the Roanoke newspaper and the following text:

> For the record, I think the law should bar people from posting addresses along with incitements to violence on the internet as well. However, having repeatedly sued anti-racists and sought injunctions against them three years ago when they

1

published my name and address (at the time) on the internet along with calls for people to assault me, then came to my home and my property and did assault me, personally, once unarmed and once with a gun, vandalized my rental properties, and smashed the windows out of my car, I have learned that not only is [it] not illegal to post that information, but it is not illegal to carry out acts of violence as well.  (And, as folk know, I have twice been arrested for beating or shooting anti-racist activists who have attempted to disrupt my business, and twice been acquitted – and the lesson I learned there is that one cannot rely on the police and the justice system for law and order; one must often rely on one's self).

The Roanoke Times has been one of the leading advocates of the "right" of anti-racists and communists to physically attack me, and, as Roanoke residents know, repeatedly published editorials and editorialized news calling for me to either be killed or bankrupted.  Based on the court decisions that have come out of those cases, I have determined that the same tactics can be used against antifa without any legal penalty – just as the Jena case seems to me to imply white activists may lynch blacks and commit attempted murder without legal penalty.  I don't believe in "free speech" as a general principle and I think speech on the internet is too free – however, as long as anti-racists and Jews are permitted to publish calls for violence which they intend, personally, to carry out, then they have to realize that they are not the only ones capable of violent behavior.

When the courts start enforcing laws against internet threats and actual violence against anti-racists and the mainstream, Jewish owned media which finances and encourages them, I will stop broadcasting people's names and addresses with the opinion they should be lynched.  However, as long as we live in a society in which laws are not enforced against Jews, Marxists and the other privileged children of the bourgeoisie, I will take advantage of that and use the lawless chaos they've created to push my view, which is that all Jews and Marxists (including their fellow traveling neo-cons, neo-liberals, Zionists and Judaized-Christians in both the Republican and Democratic Parties) should be shot, rather than debated – along with their fellow travelers and chosen pets in the Negro "rights" movement.

(Govt. Ex. 8 at 4-5; Tr. at 214-16, 291.)

Two pages later, a blog post stated:

On the Jena 6 front, I will say that we have received communications from the White Order of Thule stating that they have "business" with the Jena 6 and they would like the world to know this.  For those unfamiliar with the White Order of Thule, imagine a prison gang composed entirely of highly intelligent and utterly insane serial killers.  If you can, you'd be pretty close.  If any of them are out of prison, I would not be surprised if there is some action in Jena pretty soon.

(Govt Ex. 8 at 7; Tr. at 216.)

On the following page:

Those looking for the addresses of the Jena 6 should scroll to the bottom. My view of the Jena 6 is this:

If a group of black kids can go to the home of a white kid, drag him out of the house, and attempt to murder him, and then have the legal system let them get away with it, then a group of white people can go to the homes of the Jena 6, drag them out of the house, and attempt to murder them too, and have the legal system let us get away with it. If we succeed in our attempt, where they failed, that's just luck of the draw. And, moreover, if Jesse Jackson and Al Sharpton can say it is right and legal for niggers to drag white kids out of the house and attempt to murder them, then I can say its right and legal for white people to drag niggers out of the house and attempt to murder them – and there isn't much those niggers can do about it.

Now, the legal system has not yet failed, and I think, more and more, that it might not, but it is outrageous to me that a bunch of niggers should be allowed to march in the streets and demand the "right" to assault white people without punishment. What these niggers don't understand is that, as soon as they win the "right" to assault people without punishment, we will take that right too, being all democratic and for "equal rights" as we are, and give them the same back. For too long niggers have been able to demand that white people play "by the rules" while they go wild in the street – if they don't want to stop that, the time for white people to show them that we know everything they do about violence plus a few tricks their ape brains haven't figured out yet is right at hand. Our ancestors didn't kill every raping, murdering, robbing Indian in this country to have their descendants face a bunch of raping, murdering and robbing niggers – and its time the niggers learned that.

For those who have heard so much about our website, please realize that the American National Socialist Workers Party is not just a website, but a real world organization. We do fun stuff like <u>start riots</u> and <u>kidnap famous Jews.</u> We are also publishers of a magazine, National Socialist. If you are in the US, Canada or Mexico and would like a free sample copy of National Socialist, write to us at:

ANSWP
PO Box 8601
Roanoke, VA 24014

(Govt. Ex. 8 at 8-9; Tr. at 217-18.) Finally, page 11 of exhibit 8 contains what purport to be the

addresses of five of the Jena Six. (Govt. Ex. 8 at 11; Tr. at 218.)

Exhibit 9 included a series of February 2007 posts about an attack on Elie Wiesel, the famous Holocaust survivor and author. (Tr. at 219.) The first post, dated February 9, 2007, and entitled "Attack on Elie Wiesel Confirmed. ANSWP Supporter Claims Responsibility," consisted of a "cut and paste" of an article from the <u>San Francisco Examiner</u> about "a bizarre attack" in which Wiesel "was dragged out of a San Francisco hotel elevator by an apparent Holocaust denier who reportedly had been trailing him for weeks." (Govt. Ex. 9 at 1.) The article named a suspect in the attack, Eric Hunt. (Govt. Ex. 9 at 2.) Defendant apparently inserted a comment, below the byline, stating: "We can confirm that an ANSWP supporter – though not a member – attacked and attempted to kidnap Elie Wiesel outside his hotel February 1." (Govt. Ex. 9 at 1; Tr. at 223.) On February 13, defendant posted an article entitled, "Where Elie Wiesel Lives. In Case Anyone Was Looking For Him," containing the text: "Greenwich, Connecticut – In case anyone was looking for him. Don't do anything illegal." (Govt Ex. 9 at 3; Tr. at 219.) The post then listed Wiesel's name and age, date of birth, the names of two relatives, and what purport to be three addresses for Wiesel. (Govt. Ex. 9 at 3; Tr. at 219.) On February 21, 2007, defendant posted a "Brief Statement on Eric Hunt. Since The Media Is Inquiring," stating:

> Commentary – I received a call today from the Associated Press regarding Eric Hunt and the assault on Elie Wiesel. In response, I make the following statement:
>
> "Elie Wiesel should be afraid to walk out his front door but for the rightful vengeance of white working people he and his holocaust lies have exploited.
>
> "Wiesel's book *Night* is a maudalin [sic] tale more akin to the '*Ilsa: She Wolf of the SS*' genre than a serious historical work.
>
> "For decades, the Jews and the liars have used physical force, violent attacks on peaceful demonstrators and peaceful meetings, and the violent physical force of unjust and tyrannical laws to silence those who question the holocaust lie. If

4

white people are going to undo this system, we have to be ready to adapt and use the tactics of our exploiters.

"Insofar as my views may have played a role in motivating Mr. Hunt, I can only say that I hope to inspire a hundred more young white people to sacrifice themselves for our collective racial whole. The only thing more noble than sacrifice is victory."

"Heil Hitler."

(Govt. Ex 9 at 4; Tr. at 222-23.)

Exhibit 10, a September 10, 2007, post entitled "Addresses of the Jena 6 Niggers. In Case Anyone Wants To Deliver Justice," stated:

Jena, Louisiana – Six niggers are on trial in Jena, Louisiana. Five are currently out awaiting trial. Get in touch, and let them know justice is coming. Their addresses and phone numbers are [list of names, addresses, and phone numbers.]

(Govt Ex. 10 at 1; Tr. at 224.)[1]

Exhibit 11, a March 26, 2008 post regarding Richard Warman, the Canadian civil rights lawyer, stated:

Kill Richard Warman
Man Behind Human Rights Tribunal's Abuses Should Be Executed

Commentary – Richard Warman, the sometimes Jewish, sometimes not, attorney behind the abuses of Canada's Human Rights Tribunal should be drug out into the street and shot, after appropriate trial by a revolutionary tribunal of Canada's white activists. It won't be hard to do, he can be found, easily, at his home, at [address.]

(Govt. Ex. 11 at 1; Tr. at 227.) The post continued:

---

[1]Unlike the other exhibits, this document indicates at the top: "This is Google's cache of http://www.overthrow.com/lsn/news.asp?articleID=10585. It is a snapshot of the page as it appeared on Oct 11, 2008 06:42:32 GMT. The current page could have changed in the meantime. Learn more" (Govt. Ex. 10 at 1; Tr. at 298.) On cross-examination, Agent Mazzola testified that she did not know if this article was deleted off the website but still available on Google. (Tr. at 299.)

> In the United States, it is legal to advocate the murder of our enemies aborad [sic]. In the past decade, the Jews have used this right to urge everything from the execution of Saddam Hussein to nuclear attacks on Basra and Baghdad. But when our enemies aboard [sic] come to be defined as our enemies in our Jew-controlled neighbor to the North, people seem to take things in a different vein. Call for the death of Osama bin Laden, confirmed enemy of world Jewry, and you're just another flag-waving faggot, ready to die for the Zionist Occupation; call for the death of Richard Warman, and suddenly demands are being made that you be investigated for murder.
>
> Warman and those in the Canadian government who sponsor him are a blight on the face of the human race. If America had any decency, we would declare war on Canada and wipe from the face of the earth the petty tyranny that has settled over that country and chosen to inflict the most inhuman and Jewish tortures on its people in the name of "human rights." But America is too weak to police even its own continent, its latest foreign wars having sapped the last of its life blood and left it a decimated, impoverished and bankrupt wreck.
>
> We may no longer have the social cohesion and sense of purpose necessary to fight as a country, but those of us who have the social cohesion and sense of purpose necessary to unify as a race must take notice of an irreconcilable fact: Richard Warman is an enemy, not just of the white race, but of all humanity, and he must be killed. Find him at home and let him know you agree: [address].
> ---
> Emailed to you by:
>
> Overthrow.com
> ATTN: Bill White, Editor

(Govt. Ex. 11 at 1-2; Tr. at 227-29.) As Exhibit 11 depicts, although the "Kill Richard Warman" post was created before the "Kill This Nigger?" magazine, that magazine appears on the left hand side of Warman post. (Tr. at 226.)

Exhibit 13, a February 28, 2005 post entitled "Hale Judge's Mother, Husband Murdered. White Nationalist Start String Of Assassinations At Feds Who Framed Creator Leader," read as follows:

> Chicago, Illinois. The husband and mother of the judge who shut down the World Church of the Creator have been assassinated by white nationalists who are promising to kill every federal agent and Jewish official associated with the case.

6

According to a statement released tonight to white nationalist news service, individuals identifying themselves as members of the World Church of the Creator took responsibility for the killings and promised that other bodies would follow . . .

The high profile assassinations took place at Lefkow's house in the 5200 block of North Lakewood Avenue in Chicago, Illinois. The bodies were discovered when Lefkow returned from work at 6 PM.

The killing is not the first linked to the Creator group. Benjamin Smith, the most prominent, killed nine people and wounded two others in a 1999 shooting rampage.

According to the statement released to the white-oriented press, other individuals associated with the case, most likely federal informer Tony Evola, the TE-TA-MA foundation, the Anti-Defamation League of B'nai B'rith, the federal prosecutors and investigators, and other minor anti-racist activists who taunted and encouraged the frame-up of Hale, may be future targets.

After the Hale trial, this website published personal information on Tony Evola, the federal informer who originally set Hale up, leading FBI officials to say that they would do "whatever was in their power" to shut this website down – something they have still not succeeded in doing.

After Hale's works were banned by Lefkow's decision, which was imposed upon her by a higher Court of Appeals, this website republished them on principle, and continues to republish, leading to a press release from the Anti-Defamation League of B'nai B'rith calling for a federal effort to shut this website down.

---
Emailed to you by:

Libertarian Socialist News
ATTN: Bill White, Editor

(Govt. Ex. 13 at 1-2; Tr. at 229-31.)

Exhibit 14, a March 1, 2005 post entitled "I Don't Feel Bad About The Hit On Judge Lefkow. And I Don't Think Others Should, Either" stated:

I don't feel bad that Judge Lefkow's family was murdered today. In fact, when I heard the story I laughed. "Good for them!" was my first thought.

I do feel bad that I see white nationalists running around saying that this

7

assassination was an FBI-Mossad conspiracy against white activists. Do you know what motivates that kind of thing? Fear. Fear that there will be revenge by the government on people who hold white nationalist views, and, really, fear that the government might personally do something to you because you hold white nationalist views. There is another word for that kind of fear – cowardice.

Everyone associated with the Matt Hale trial has deserved assassination for a long time. At the time, I believe I said that if I were Hale and I was being railroaded like this I would kill – not the judge – but the ADL officers involved and their witnesses. In general, I would not kill a judge's family – it strikes me as pointless and overly harsh – but in this case the family member's [sic] involved were Jews (well, in one case a converso), and really I can't mourn over dead Jews. Their people are vicious and bloodthirsty; they murdered at least 100 million non-Jews during the 20th Century; they've started the 21st Century by advocating the murder of more than one billion adherents of Islam; they are the persecutors of the white race, and have been responsible for the exploitation, oppression, and murders of hundreds of millions of our people; they bear collective guilt, and the world is a better place the less Jews there are in it. Its [sic] a harsh thing to have to say, but it is the truth.

But the abstract question of the ethics of killing Jews in general must be set aside here, because the meat of this question is whether it was just or unjust in this specific case for people who have been persecuted and denied their religion by the dictates of Judge Lefkow and the system she promotes to retaliate and wreck vengeance against her. In my view, it was clearly just, and I look forward to seeing who else this new white nationalist group of assassins kills next.

(Govt. Ex. 14 at 1; Tr. at 231-33.) The post continued:

Yesterday, when the ADL officials and FBI agents and federal prosecutors and federal judges who are responsible for the persecution of the white race went to bed, they had no fear that they would ever be held accountable for any unreasonable or immoral ruling against a white activist. White activists were ridiculed. They were mocked. They were the kind of silly Jewish-television-show bad guy that anyone could kick around and know they could get away with it. For all the propaganda alleging white activists were "violent" "terrorist" or "dangerous", to the Jewish system white nationalists were nothing more than a bunch of fringe losers, not to be taken seriously.

Tonight, as these same ADL officials and FBI agents and federal prosecutors and federal judges go to bed, they have to think that tomorrow they may wake up and find their families murdered. Just as anti-racists routinely terrorize the families of white activists, threatening rape and murder against people who have done nothing but have a relative who is a dissident, and just as these same ADL officials and FBI agents and federal prosecutors and federal judges protected

8

those anti-racists in their terror and their terrorism, tonight those same ADL officials and FBI agents and federal prosecutors and federal judges can go to bed with the same vague feeling of unease and fear that they have inflicted and perpetuated through their miscarriage of justice, their subservience to evil, and their refusal to enforce the law.

I do not mourn the assassination of Judge Lefkow's family, and I hope the killer wrecks more havoc among the enemies of humanity, and that the killer is never found. I do not say that because I have personal animosity for Judge Lefkow, or because I sick [sic] have a love of violence or death. What I love is justice, and this act of violence, publicized as it is to millions of those who passively engage in evil in the name of the Jew, sends a message of justice to those who thought they could be protected in the performance of evil.

Killing people – killing people's families – is not good. It is not a right thing to do. In a world that was right there would be no murder. But an eye for an eye is justice, and such acts of justice make me think, sometimes, that maybe there are some things still right with the world.

---

Emailed to you by:

Libertarian Socialist News
ATTN: Bill White, Editor

(Govt. Ex. 14 at 2-3; Tr. at 233-35.)[2]

Exhibit 15, also posted on March 1, 2005, consisted of a "cut and paste" article from the Chicago Tribune entitled "Police Confirm Assassination in Lefkow Killings. Aryan Brotherhood, WAR, WCOTC Implicated In Papers." (Govt. Ex. 15 at 1; Tr. at 235.)[3] The post also contained several bracketed parenthetical comments attributed to "Bill." (Tr. at 235.) The first stated:

---

[2]The older posts from 2005, such as exhibits 13-16, reference "Libertarian Socialist News" rather than ANSWP on the ending byline. (Tr. at 303.) The ANSWP did not come into existence until 2006. (Tr. at 304, 440-42.)

[3]At the bottom of the page, exhibit 15 indicates that it comes from http://webmail.aol.com. (Govt. Ex. 15 at 1; Tr. at 305-06.) Nowhere on the document does it say that it came from Overthrow.com. (Tr. at 306.)

[Bill: This website is mentioned in the CNN coverage. Apparently, the FBI issued a national police bulletin as a result of our disruption of their case.

As to who did it, in my humble opinions [sic], Matt Hale should immediately be eliminated as a suspect, even when he had contact with his supporters, he wasn't capable of seriously conducting this kind of act.]

(Govt. Ex. 15 at 1; Tr. at 235-36.) Another stated:

[Bill: A few observations: 1) Matt Hale never really tried to kill anyone – the whole thing was a frame-up; 2) Matt Hale was never really capable of killing anyone – he just liked to talk about these things because he thought they made him sound cool; 3) The kind of violence one could expect Hale to be involved in is the random, no planing, Benjamin Smith go-psycho and get caught type, not this kind of well planned, premeditated murder.

This not Hale. This is someone who spent years waiting for the heat Hale was bringing to cool off, then struck in a deliberate, well planned and effective fashion.]

(Govt. Ex. 15 at 3; Tr. at 236.)

Exhibit 16, also posted on March 1, 2005, was entitled, "Hirschhaut, Fitzgerald, Kneir, Peters And Weisman May Be Next On Hit List. Addresses Of Future Targets Posted To Internet Discussion Groups," and stated:

Chicago, Illinois – An email with the home addresses and detailed personal information of a slew of federal and Jewish officials involved in the Matt Hale case has circulated on white nationalist discussion groups, with a notation that any of them may be the next targets of the unknown nationalist assassin who killed the family of Chicago judge Joan Lefkow.

Richard S. Hirschhaut, Chicago Regional Director of the Anti-Defamation League of B'nai B'rith, a man who claimed in press releases to have spent "five years" advocating the arrest and trial of Matt Hale, and who coordinated the TE-TA-MA foundation, had his name heading the list of purported future victims, along with his address and personal information on his family and daily activities. Hirschhaut, a former director of the San Francisco branch of the ADL, was the subject of a federal indictment in 1992 after it was found that he had been directing illegal surveillance operations against leftist and pro-Palestinian groups in the Bay area.

While Overthrow would usually not hesitate to republish the personal information

10

on these scumbags in full, at this time we feel there is so great a potential for action linked to such posting that we are not going to post email and its details at this time.

Also named on the email are US Attorney Patrick Fitzgerald, who oversaw the prosecution conducted by Assistant US Attorneys Victoria Peters and M. David Weisman, who are also named in the email, as well as personal information on F.B.I. Special Agent in Charge Thomas Kneir, who was responsible for overseeing the investigation into Hale's activities, and who managed federal informer Tony Evola.

Whether the email represents a legitimate threat, or just some angry activists blowing off steam, remains to be seen. After the unexpected assassination of Judge Lefkow's family, it seems that anything may be possible.

Emailed to you by:

Libertarian Socialist News
ATTN: Bill White, Editor

(Govt. Ex. 16; Tr. at 237-38.)

Exhibit 18 consisted of two posts regarding Richard Warman. (Govt. Ex. 18; Tr. at 239.)

The first, dated February 1, 2007, and entitled "Richard Warman Has Nervous Breakdown In

Court. 'My Life Is In Danger,'" stated:

Toronto, Canada – Jew attorney Richard Warman had a nervous breakdown in front [of] the Canadian Human Rights Tribunal today after Warman opponents distributed copies of posts Warman had made on various internet forums indicating he might be mentally ill.
. . .
Richard Warman lives at [address] and should be killed for his crimes against humanity. Instead, his inhuman agenda is furthered by the Jewish controlled government of Canada, which has, based on Warman's complaints, arrested and/or imprisoned at least half a dozen whites for making statements against Jewish tyranny in their country.

(Govt. Ex. 18; Tr. at 239.) The second post, dated April 9, 2008, entitled "Richard Warman

Suffering From Mental Illness. Lawsuit Filed Naming Dozens of 'Defamation' Defendants,"

stated:

Toronto, Canada – Attorney Richard Warman, apparently suffering from mental illness, has a filed a lawsuit accusing dozens of Canadian companies and individuals of "libeling" him, including the National Post and several major Canadian newspapers, after a news story revealing he posed as [a] "bigot" and posted comments calling a Canadian politician a "nigger" and a "cunt" were published by Canada's largest newspaper chain and then republished on dozens of internet blogs.

The information was attached to additional information showing Warman has blatantly violated even tyrannical Canadian law by ordering judges, apparently on the authority of World Jewry, not to allow evidence against defendants to be presented to them, but only considered "secretly".

Richard Warman is a terrorist who, on behalf of international Jewry and the Canadian Jewish Congress has filed dozens of suits accusing white Canadians of the crime of challenging the authority of the Canadian state and making political critiques hostile to non-white minorities. Because he is a terrorist and Canada is harboring him, the United States should invade Canada and kill Richard Warman. He will be easy to find, because he lives at [address].

Warman has previously demanded the publisher of this website be extradited [sic] to Canada to face charges of criticizing him in a public venue. The government of the United States has so far declined.

(Govt. Ex. 18 at 2; Tr. at 240.)

Exhibit 19, entitled "Richard Warman Announces He 'Won't Be Intimidated' Which Means He Already Has Been," was posted on July 12, 2007, and consisted of a cut and paste article about Warman from the <u>Ottawa Citizen</u> newspaper, with some parenthetical statements from "Bill" within it. (Govt. Ex. 19; Tr. at 241.) In the first parenthetical, Warman's address is again listed. On the second page of the article, a parenthetical stated: "[Bill: Sometimes, in the press, he is a Jew. Sometimes he is not. No matter. He dies just as easily either way.]" (Govt. Ex. 19 at 2; Tr. at 241.)

Exhibit 23, a January 19, 2007 post entitled "Former Home Of Federal Informer

Attacked. Man Who Wore Wire On Volksfront Activist Targeted By 'White Supremacists,'"[4] read as follows:

> Eugene, Oregon – A former residence of Andrew Hengel, whom Volksfront prisoner Jake Laskey and others accused of being a federal informer and wearing a wire on him, was attacked last night at 3:45 AM by unknown persons believed to be "white supremacists".
>
> According to an angry email sent to Overthrow.com by Hengel, unknown individuals banged on the door to his former home, made death threats, and accosted residents after copies of an Overthrow.com article on Laskey's accusations and "white supremacy" fliers were distributed in the neighborhood.

(Govt. Ex. 23 at 1; Tr. at 271, 312.) Mazzola testified that through her investigation she learned that Jake Laskey is white supremacist convicted of various crimes. (Tr. at 272.)

Exhibit 30, a June 3, 2007 post entitled "Nigger Says Black On White Racial Crime Should Not Be Reported. Hatred Against Whites Seeps Out Of Miami Herald," stated:

> Miami, Florida – A nigger employed by the Miami Herald has published an editorial justifying the brutal murders of Channon Christian and Chris Newsome and stating that newspapers should not report black on white racial crime.
>
> Leonard Pitts, a nigger employed by the Herald, said that those upset about the brutal rape of both white victims should "Cry me a river . . . It always amazes me when white people put on the victim hat"

(Govt. Ex. 30 at 1; Tr. at 272.) The post then provided Pitts's date of birth, address, wife's name, and phone number, stating: "His wife gets very upset when you call." The post conclude with the byline: "Overthrow.com / White Politics, LLC. ATTN: Bill White, Editor." (Govt. Ex. 30 at 1; Tr. at 272-273.)

Exhibit 31, originally posted on June 6, 2007 and entitled "Miami Herald And Leonard

---

[4]Although this article was posted in 2007, given the "dynamic environment" of the website, the "Obama assassination" magazine appeared next to it on the print-out introduced in evidence. (Tr. at 271.)

Pitts Upset.  Demand We Stop Encouraging People To 'Harass' Them," read as follows:

> Miami, Florida – [Bill: Note that I have not encouraged anyone to harass Mr. Pitts. Just to contact him and share their thoughts and feelings.  The email I received today from the Miami Herald and my response follow:]
>
> – "Wilson, Dave - Miami" [email address] wrote:
> Mr. Bill White:
>
> Sir, I have to strongly protest the forum posting on your website – [article number] – that encourages the harassment of Miami Herald columnist Leonard Pitts and his family.  You, your members or your contributors may disagree with what Mr. Pitts writes, but it doesn't license harassment.  This posting also appears on a Yahoo! news group that is affiliated with your organization.
>
> Please remove the personal information about Mr. Pitts from these postings immediately.
>
> Thank you for your attention to this matter.
>
> Sincerely,
>
> Dave Wilson
> Managing Editor/News
>
> . . .
>
> Dear Mr. Wilson:
>
> We have no intention of removing Mr. Pitts' personal information.
>
> Frankly, if some loony took the info and killed him, I wouldn't shed a tear.
>
> That also goes for your whole news room.
>
> Bill White, Commander
> American National Socialist Workers Party

(Govt. Ex. 31 at 1-2; Tr. at 273-74.)

Exhibit 34, posted on April 8, 2008, was entitled "Leonard Pitts Still Afraid to Travel Without Bodyguards.  Continuing Security Needed Over His 'Cry Me A River' Column: He Will Be Speaking In Tacoma, Washington Thursday," stated:

14

Tacoma, Washington – [Bill: This nigger has written columns openly justifying the rape and murder of white people on the grounds that the alleged "oppression" of Negroes under slavery demands retribution. His black power kill whitey column is syndicated by the Miami Herald and is still carried by many newspapers.

Leonard Pitts lives at [address] with his wife Marilyn, and his home phone is or was [phone number].

Apparently, he is still walking around with off duty police and bodyguards, but we know this, Lenny – the white man hasn't forgotten, but eventually, whoever's paying for your security is going to think he has . . .]

(Govt. Ex. 34 at 1; Tr. at 275.) The balance of the post appears to be a cut and paste from a newspaper article about Pitts, which indicates that his "Cry me a river" column:

brought him so many death threats the FBI was called in to investigate. Such threats were nothing new, Pitts said, but "what made this different was it was an organized campaign." A white-supremacist Web site posted his home address and phone number and his wife's name. Other similar Web sites got into the act, and he was inundated with hostile phone calls and e-mails. "That upped the ante," he said, and arrangements were made to protect him. He wouldn't go into specifics, but said, "We'll just say there was security."

Death threats are relatively rare, he said, but hate mail is a constant for Pitts. Asked if the 2007 incident made him more cautious about the subjects he chooses to write about, he replied, "the day it has a chilling effect is the day I go and go something else." Pitts left no doubt that that day is nowhere in sight.

(Govt. Ex. 34 at 3; Tr. at 276.)

Finally, exhibit 35, an article posted on September 20, 2007 entitled "Lynch The Jena 6. We Are Anxiously Awaiting Their Release," stated:

Jena, Louisiana – The American National Socialist Workers Party anxiously awaits the release of the Jena 6 niggers, responsible for an unprovoked assault on a white high [sic] student, so the six can face true justice.

"If these niggers are released or acquitted, we will find out where they live and make sure that white activists and white citizens in Louisiana know it," ANSWP Commander Bill White stated today, "We'll mail directions to their homes to every white man in Louisiana if we have to in order to find someone willing to deliver justice."

15

The six niggers involved in the crime are currently being held pending trial on felony charges of assault.

Nigger agitators across the country, financed and supported by Jewish and homosexual communists like the leaders of the Southern Poverty Law Center, have organized rallies to demand the niggers involved in the assault be acquitted of their crimes.

"Those niggers are much better off in the hands of the justice system than they are in the hands of the white citizenry of this nation," ANSWP Commander Bill White stated, "And we intend to make sure they know that."

---

Emailed to you by:

Libertarian Socialist News
ATTN: Bill White, Editor

(Govt. Ex. 35 at 1; Tr. at 277-78.)