UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 08 CR 851 |
| v. | ) | |
| | ) | Honorable Lynn Adelman |
| WILLIAM WHITE | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The UNITED STATES OF AMERICA, by and through GARY S. SHAPIRO, United States Attorney for the Northern District of Illinois, respectfully submits its Sentencing Memorandum with respect to defendant WILLIAM WHITE, stating as follows:

## I.    INTRODUCTION

Following a jury trial, the defendant was convicted of soliciting a crime of violence against a former federal juror, Juror A, in retaliation for a guilty verdict to which the juror assented finding white supremacist Matthew Hale guilty of multiple crimes, including soliciting the murder of a sitting District Court Judge. Guided by his unjustifiable anger, the defendant used his website to broadcast the identity of the juror to a target audience he knew to be capable of violence and motivated by the same hatred as the defendant. Taking into account all of the Section 3553(a) sentencing factors, this Court should sentence the defendant

to no less than the high-end of the applicable Guidelines range of 63 months imprisonment.

## II.    FACTUAL BACKGROUND

In January 2003, Matthew Hale, the leader of a white supremacist organization known as the World Church of the Creator, was charged in a federal criminal case in the Northern District of Illinois with multiple counts of solicitation of the murder of United States District Judge Joan Humphrey Lefkow and obstruction of justice. Hale was tried before a jury in the Northern District of Illinois, convicted of one count of solicitation and two counts of obstruction, and sentenced to 480 months' imprisonment. Juror A was the foreperson of the jury that convicted Hale.

On September 11, 2008, five years after his service as a juror concluded, the defendant drew Juror A back into the dark and hate-filled world of white supremacists by soliciting others to do Juror A violent physical harm. Juror A's nightmare began on September 11, 2008 when he received a call on his cell phone from a phone registered to the defendant's wife. During the conversation with Juror A, the male caller sought to collect and verify certain personal identifying information. Less than a half hour later, defendant turned to his website "Overthrow.com" to call for other white supremacists to seek out and harm Juror A by posting two entries related to Juror A. The first entry, posted

to the "News" section of Overthrow, was titled "Hale Seeks to Have Sentence Overturned - Gay Jewish Anti-Racist Led Jury." The second entry, posted to the "Blog" section of Overthrow, was titled, "The Juror Who Convicted Matt Hale." Both entries included the language:

> Gay anti-racist [Juror A] was a juror who played a key role in convicting Matt Hale. Born [Date of Birth], he lives at [address] with his gay black lover and his cat [name]. His phone number is [phone number], cell phone [phone number], and his office is [phone number].

The article posted to the "News" section continued, "gay Jewish Assistant Dean at Northwestern University, [Juror A], who has a gay black lover and ties to professional anti-racist groups, and who also personally knew a Northwestern University basketball coach killed by Ben Smith, a follower of Hale, was allowed to sit on his jury without challenge and played a leading role in inciting both the conviction and harsh sentence that followed." The entries also featured color photographs of Juror A.

The photograph of Juror A was displayed through a link to an identical photograph which appeared on Northwestern University's website. Juror A quickly learned of the posting and contacted the FBI and his employer, Northwestern. Northwestern then removed it from its website, rendering the link invalid. Not to be deterred, on September 12, 2008, defendant posted a

follow-up entry on Overthrow titled, "[Juror A] Update - Since They Blocked the first photo." This entry read:

> Gay anti-racist [Juror A] was a juror who played a key role in convicting Matt Hale. Born [Date of Birth], he lives at [Adress] with his gay black lover and his cat [name]. His phone number is [phone number], cell phone [phone number], and his office is [phone number]. Note that Northwestern University blocked much of [Juror A]'s information after we linked to his photograph.

Although identical in appearance to the previous photo, the picture of [Juror A] that appeared in the September 12 posting was embedded in the Overthrow server so that it would appear on the website, regardless of any action taken by Northwestern.

By placing this solicitation on his website, the defendant knew it would reach an audience that included people prone to engage in acts of violence directed at non-whites, Jews, homosexuals, and persons perceived by white supremacists as acting contrary to the interests of the white race. In short, the defendant was aware that there were other people filled with the same intolerance and hate as the defendant who would be motivated to pick up the defendant's mantle, use the information he provided, and hurt, or even kill, Juror A.

In addition to the postings relating to Juror A, Overthrow.com featured multiple other postings that displayed what purported to be the home address and/or other personal identifying information of individuals who were described

-4-

as enemies of the defendant and the white supremacist movement. These postings were readily available and easily accessible on defendant's website at the time the defendant made the Juror A postings. As certain of these postings directly expressed the defendant's desire that acts of violence be committed against these enemies, the defendant intended and was aware that such postings would serve as a roadmap to let others know that he wished the same fate for Juror A.

## III.    GUIDELINE ANALYSIS

### A.    Guidelines Calculations

The government agrees with the Guidelines calculation contained in the Presentence Investigation Report ("PSR") submitted in this matter and has no other objections to the content of the PSR.[1] In particular, the government agrees that the defendant's total offense level is 22 and his criminal history is category III based on the following:

1.    Defendant has been convicted of soliciting a crime of violence against a former federal juror in retaliation for a verdict assented to by the juror, in violation of 18 U.S.C. § 1503; all in violation of 18 U.S.C. § 371. Pursuant to

---

[1]The government's version of the offense omitted the defendant's 1999 conviction for simple assault which resulted in the government's Guidelines calculation incorrectly concluding that the defendant has a criminal history category of II. The government agrees with the calculation in the PSR. The defendant's Guidelines calculation should reflect a total of four criminal history points and the defendant should be sentenced pursuant to a criminal history category of III.

Guidelines § 2X1.1(a), the base offense level for the solicitation conviction is the same as the base level for the substantive offense. Therefore, pursuant to Guidelines § 2J1.2(a), the base offense level is 14.

2. The defendant threatened to cause physical injury to the person of Juror A in order to obstruct the administration of justice. Pursuant to Guideline § 2J1.1(b)(1)(B), the offense level is increased by 8. Although the defendant's conduct occurred after the Hale trial had concluded, the Guidelines enhancement applies as defendant acted to retaliate against Juror A for Juror A's service as a juror in the Hale trial. *See United States v. Duarte*, 28 F.3d 47, 48-49 (7th Cir. 1994).

3. The defendant's conduct in soliciting physical harm to Juror A resulted in the unnecessary expenditure of substantial government resources related to efforts to investigate the defendant's conduct and ensure the safety of Juror A and others. Pursuant to Guideline § 2J1.2(b)(2), the offense level is increased by 3.

4. Pursuant to Guidelines § 2X1.1(b)(3)(A), because the defendant was convicted of a solicitation, his offense level is decreased by 3.

5. The defendant's criminal history points total four. Defendant receives three criminal history points for his December 18, 2009 convictions for making interstate threats and witness tampering for which he was ultimately

sentenced to 33 months' imprisonment for the substantive offense and an additional 10 months' imprisonment for a violation of supervised release after defendant fled to Mexico. Defendant receives one additional criminal history point for his February 17, 1999 conviction for simple assault for which he was sentenced to 180 days' imprisonment.

When combined with his criminal history category of III, the defendant's adjusted offense level of 22 yields an advisory Guidelines range of 51-63 months' imprisonment.

## B.    Legal Standards

Section 3553(a) requires the court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.[2] In this case, a sentence no lower than the high-end of the applicable Guidelines range of 51-63 months is appropriate.

In order to determine the "particular" sentence to impose, the court must consider the familiar statutory factors listed in §3553(a)(1)-(7). One of those factors is the advisory range set by the Sentencing Guidelines, and another is the Commission's policy statements.    §3553(a)(4), (a)(5).    Although the

---

[2]Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  § 3553(a)(2)(A)-(D).

Sentencing Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 522 U.S. 38, 128 S. Ct. 586, 596 (2007).

In the event that this court exercises its discretion to sentence outside the advisory range, there are guideposts for evaluating what the extent of the deviation should be and when a non-Guidelines sentence will be deemed unreasonable on appeal. These guideposts are set forth in Supreme Court and Seventh Circuit cases.

First, the Supreme Court instructs that it is "clear that a district judge must give serious consideration to the extent of any departure from the Guidelines and must explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications." *Gall*, 128 S. Ct. at 594. The degree of the deviation from the advisory Guidelines range is relevant in choosing the particular sentence:

> If [the judge] decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one.

*Id.* at 597. The Seventh Circuit warns that major deviations from the advisory range are more likely to be unreasonable if the grounds for the deviation are

"overstated mitigating factors" or "normal incidents" of the offense. *United States v. Carter*, 538 F.3d 784, 790 (7th Cir. 2008). Similarly, the Seventh Circuit admonishes that sentences relying on "common" factors, rather than "particularized" ones, to justify variances are less likely to be substantively reasonable. *Id.*; *see also United States v. Vrdolyak*, 593 F.3d 676, 681-83 (7th Cir. 2010). To be sure, these are only guides and not bright-line rules for assessing reasonableness, but they are helpful in preventing excessive sentencing disparities.

## IV.    APPLICATION OF THE §3553(a) FACTORS

### A.    <u>The Seriousness of the Crime Weighs in Favor of a Substantial Sentence</u>

The direct victim of the defendant's actions in this case was Juror A. Viewing this crime in a vacuum in which only the harm to Juror A was considered would, by itself, warrant a substantial sentence. Motivated by a loathing for Juror A that was as reprehensible as it was unwarranted, the defendant reached out from his computer and changed Juror A's world forever. Pulled from his routine life into the defendant's hate-filled world, Juror A became a target to people who treat the criminally violent as celebrities. As a result of the defendant's crime, Juror A's existence became one of constantly looking over his shoulder and worrying whether every stranger was the person who had accepted the defendant's invitation to violence. Defendant's solicitation

for an attack on an innocent person cannot be justified and requires a sentence that properly accounts for the overwhelmingly negative impact to the victim.

Juror A's experience from the time of his service as a juror in Hale trial to the present paints a clear picture of the detrimental impact of the defendant's actions. As he testified at trial, Juror A so respected the fairness and due process of the judicial system to which he was exposed in the Hale trial that it inspired him to make a monumental life change and go to law school. The defendant took it upon himself to reward Juror A's faith and respect for the system by seeking others to harm him in retaliation for his involuntary, yet honorable, service in providing Hale with a fair and impartial trial. Juror A originally planned to testify at the defendant's sentencing. However, Juror A recently informed the government that this case as taken such a toll on him that he believes that, in the interest of his mental health and well-being, he cannot endure the thought of further contact with the defendant and this case. At the hands of the defendant, Juror A's outlook on our system of justice has fallen from a position where he was so enamored with the process that he changed his life to be a part of it, to the dark place it currently resides where Juror A cannot bear to set foot in a courtroom.

This Court should consider Juror A's plight for what it is, a microcosm of what would happen to our judicial system if the defendant had his way. The

greatness of the American judicial process rests on the shoulders of the jurors who set their personal lives aside to perform their civic duty when called upon. The defendant's attack on Juror A was in reality an attack on this entire system. It is without question that a system that relies so heavily on ordinary citizens performing their civic duty would collapse if those citizens had to fear the reprisal of those who do not agree with the verdicts rendered. Where the defendant so brazenly obstructed the operation of this system by targeting a juror, he committed a serious offense that must be punished accordingly.

In sum, the nature of the crime weighs heavily in favor of a substantial sentence of no less than 63 months under §3553(a).

**B.      The Need for the Sentence Imposed to Promote Deterrence**

The defendant's sentence should also be considered in the context of the deterrence that it will provide against further crimes of this sort. *See* 18 U.S.C. § 3553(a)(2). In this instance, a sentence of at least 63 months sends an important and appropriate message: crossing the line from disagreement with a verdict to criminal action is intolerable in this society. As evidenced by the jury's verdict and the Seventh Circuit's affirmation of that verdict, this was not a matter of a political discourse or a call to spirited debate. In a calculated fashion, the defendant retaliated against Juror A because of defendant's disapproval of the job Juror A performed in his service as a juror. Once more,

such an attack on the administration of justice as a whole cannot be tolerated and the nature of this offense demands a substantial sentence to deter others from following suit.

### C. Defendant's History and Characteristics Weigh in Favor of a Substantial Sentence

The defendant's history and characteristics are also significant to this Court's determination of a proper sentence. This was not the first time that the defendant played the role of internet criminal. The defendant's convictions in Virginia demonstrate how prolific he has been over the last several years in spreading his message of hate at the expense of innocent people he deems to be his enemies. In his Virginia case, the defendant threatened a bank employee because of a petty dispute; he threatened African-American tenants in an effort to impact their testimony in housing litigation; and he threatened a university professor because he disagreed with her views. This pattern of attacks against those with whom the defendant disagrees provide this Court with a clear picture of the type of person that he is. The defendant is a man who will quickly resort to threats of violence, or, as was the case here, encourage others to engage in violence on his behalf. This Court should consider the defendant's nature and impose a sentence that will both protect the public from the defendant and provide adequate deterrence to dissuade the defendant from engaging in such conduct in the future.

Although this Court should heavily consider the defendant's history and characteristics in imposing an appropriate sentence, it must be careful to recognize the unique nature of the defendant's criminal conduct in the instant case. As stated above, it is clear that the defendant has no qualms over using his website to threaten others - as he has done exactly that time and again. However, defendant's conviction here goes beyond simply lashing out at those of whom he does not approve. The defendant's conduct in this case was a direct attack on the jury system motivated by a juror's participation in a guilty verdict against a man the defendant considered to be an ally. Consistent with the § 3553(a) factors, this unique attack warrants its own punishment. Accordingly, to the extent that an overlap in the proper calculation of defendant's sentence exists, this Court should impose its sentence consecutive to the sentence defendant received in Virginia. Pursuant to 18 U.S.C. § 3584(a), there is a presumption that multiple terms of imprisonment imposed at different times (as is the case here) run consecutively. Despite the superficial similarities of this case and defendant's case in Virginia, each involving the targeting of victims over the internet, the unique and severe nature of this crime provides every reason that a consecutive sentence be imposed and no reason to move away from this presumption. Moreover, due to the severity of this offense, in applying the § 3553(a) factors, this Court should not use the period of incarceration now

-13-

credited to the defendant's Virginia sentence as a means to mitigate the sentence warranted here.

## Conclusion

WHEREFORE, the government respectfully requests that sentence be imposed no lower than the high-end the applicable Guidelines range.

<div style="margin-left: 40%;">

Respectfully submitted,
GARY S. SHAPIRO
United States Attorney


By:    *s/ Michael Ferrara*
       MICHAEL FERRARA
       WILLIAM R. HOGAN, JR.
       Assistant United States Attorneys
       United States Attorney's Office
       219 South Dearborn Street, 5th Floor
       Chicago, Illinois  60604
       (312) 353-5300

</div>

Dated: February 13, 2013

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that the following document:

## GOVERNMENT'S SENTENCING MEMORANDUM

was served February 13, 2013, in accordance with FED. R. CIV. P. 5, LR5.5, and the General Order on Electronic Case filing pursuant to the District Court's Electronic Case Filing (ECF) system as to ECF filers.

<div style="margin-left:40%">

Respectfully submitted,
GARY S. SHAPIRO
United States Attorney

By:   s/ Michael Ferrara
MICHAEL FERRARA
Assistant United States Attorney
United States Attorney's Office
219 South Dearborn Street
Chicago, Illinois  60604
(312) 886-7649

</div>

-1-